KATHRYN SAUER v. RURAL CO-OPERATIVE POWER ASSOCIATION OF MAPLE LAKE.[1]

January 23, 1948.

No. 34,479.

[1]Reported in 31 N. W. (2d) 15.

*Phillips & Sherwood,* for appellant.
*Charles H. Weyl* and *Atwood & Quinlivan,* for respondent.

MAGNEY, JUSTICE.

The jury rendered a verdict for defendant. Plaintiff appeals from the judgment.

Defendant is engaged in generating, distributing, and selling electric energy and owns and operates power transmission lines in Stearns county and beyond. One such line, running south along state highway No. 23 and carrying a current of 34,500 volts, crosses the highway diagonally from the east to the west side about a mile and a half east of the village of Roscoe. A telephone line, running east and west, built before the power line, crosses underneath the power line at that point. The maximum clearance between the power line and the ground is 40 or 42 feet, and that between the telephone line and the ground 20 to 30 feet. The power line connects with a generating plant at Maple Lake. At the generating plant defendant had relays, a device which will throw a switch and shut off the power if there is excessive loading of power. A greater quantity of electric energy on the line than it is supposed to carry will operate the relay so as to turn the switch and break the circuit. The relays are set to carry normal loading, and if it exceeds that point they will operate. When lightning strikes a power line, it

produces an overload if it is severe enough. N. E. Ryall, manager of defendant, testified that if a wire breaks and falls to the ground, whether the switch would be caused to be thrown would depend on how good a contact that wire was making with the actual earth. "If the contact with the ground is secure enough they will operate. If the loading exceeds the setting on the relays it is determined by your load. You can't set them under what your maximum load will become during the period of the day." When one of these high-tension lines breaks and falls to the ground and the switch is not cut through the operation of the relay or otherwise, the wire is exceedingly dangerous. The original function of the relay, in addition to protecting the power line, was also calculated to protect persons and the public generally. If the contact with the ground is good enough, it will throw the switch, but if it is not good enough, the device will not operate.

On the morning of August 10, 1944, lightning struck defendant's pole No. 2713 at the intersection mentioned on top of the insulator. One of the wires was melted off at the pole and fell to the ground. In falling, it came in contact with the wires of the telephone line. It was lying on the telephone wire and the dirt of the traveled portion of the road and angled off into the ditch. There were lightning arresters at each end of the line and at the generating plant end, but none on this pole or anywhere on the line.

Decedent lived in the village of Roscoe. He was in the retail lumber business. On the morning of August 10, 1944, sparks and flames were shooting out from the wooden box of one of the two telephone installations in the Sauer home. Sauer noticed it and told members of the family to get up and help him put the fire out. Then he went out. Mrs. Sauer put water on the box until it stopped burning. The telephone wires, about 12 to 18 inches apart where they entered the Sauer home, were also burning. There were two ground wires, but they were grounded to the same spot. There was a wire fence about two or three feet from the house. Sauer went between this wire fence and the house and with a long-handled garden rake started to pull the wires. At first he tried to pull down the ground wire. It

was slack, and when it was touched it would spark. So, for the sake of safety, he went outside the fence. After he had gone outside the fence, he was pulling with the rake on the wire where it was fastened to the house. He hooked it with a sweep, and the wire broke. It fell across his shoulder and electrocuted him. Peter Karls, his brother-in-law, saw him pulling at the wires. He testified:

"Q. And you told him at that time to be careful because it wasn't just the telephone wires that were doing that?

"A. Yes, that is right.

"Q. And he kept on holding the wooden handle of the rake and pulling?

"A. That is right.

\* \* \* \* \*

"Q. And was it when he was in between the fence and the house or was it when he was outside of the fence that you told him to look out, that it was not just the telephone wire?

"A. Oh, it was both between the fence and the house. When I come up there first and discovered that there was sparks on the ground wire, then I said there is something very seriously wrong here.

"Q. And then he got outside?

"A. Yes, sir."

Decedent was three to four feet out from the fence.

"Q. So that then he got outside of the fence and started to pull and you told him again to be careful?

"A. Well, when he got over the fence I was standing between the fence and that, more or less looking at that combination.

"Q. You were watching the ground wires?

"A. Yes; and when he pulled it I jumped away because I thought if the wire would break there was no way for me to tell which way, so I really got away a ways from the ground.

"Q. You went away so that if the wire did break it would not snap up at you?

"A. That is right.

\* \* \* \* \*

"Q. * * * After you said that to Mr. Sauer, or when you said that to him he was between the fence and the house?

"A. Yes.

"Q. And then he got out?

"A. Yes.

"Q. And outside of the fence?

"A. Yes.

"Q. And pulled again on the wire until it broke?

"A. Yes."

Karls jerked the wire away from decedent with the rake.

On this evidence, the court submitted the questions of defendant's negligence and decedent's contributory negligence to the jury. In submitting the question of defendant's negligence, the *res ipsa loquitur* rule was given.

■ Plaintiff contends that the court erred in submitting the question of contributory negligence to the jury. She claims that decedent was free from contributory negligence as a matter of law. Defendant claims that decedent was guilty of contributory negligence as a matter of law. We have set out in detail all the evidence bearing on this question. In our opinion, on the evidence it cannot be said either that decedent was free from negligence as a matter of law or that he was guilty of contributory negligence as a matter of law. It was a question for the jury to determine.

■ The court charged the jury:

"* * * But if you find from the evidence that defendant was negligent in designing, maintaining, constructing or operating its transmission lines, then you would go further and determine whether or not the accident in question was due to the negligence of the defendant or to an Act of God. If it was due to an Act of God, then, of course, the defendant would not be responsible in this action."

Plaintiff challenges the correctness of this instruction in these words:

"The Court erred in submitting an act of God as the proximate cause of the death of plaintiff's intestate."

That is probably sufficient to raise the question of the real vice in the above-quoted instruction.

A bolt or stroke of lightning is certainly an act of God. If such a phenomenon is the sole cause of an injury, then of course no liability for causing the injury can be placed upon anyone. However, if the injury is the joint result of a negligent act and an act of God, the actor is not relieved. This principle is stated in 4 Dunnell, Dig. § 7007, as follows:

"* * * 'if damage is caused by the concurrent force of defendant's neglect and some other cause for which he is not responsible, including an act of God, he is nevertheless liable if his negligence is one of the proximate causes of the injury complained of, even though, under the particular circumstances, he was not bound to anticipate the interference of the intervening force which concurred with his own.'" Moore v. Townsend, 76 Minn. 64, 78 N. W. 880; Bibb Broom Corn Co. v. A. T. & S. F. Ry. Co. 94 Minn. 269, 102 N. W. 709, 69 L. R. A. 509, 110 A. S. R. 361, 3 Ann. Cas. 450.

In the Bibb case the court said (94 Minn. 275, 102 N. W. 711):

"* * * That defendant's neglect concurred and mingled with the act of God seems the only reasonable conclusion the facts will warrant, and we feel safe in applying the general rule that an act of God is not in such cases a defense."

In Whitaker v. Pitcairn, 351 Mo. 848, 857, 174 S. W. (2d) 163, 168, the court states the rule as follows:

"* * * When the result in part is ascribable to the participation of man, either through active intervention or neglect or failure to act, 'the whole occurrence is thereby humanized, as it were, and removed from the operation of the rules applicable to the acts of God.' Hence, when it is shown that in the exercise of due care, by way of anticipation or prevention, the casualty might have been averted by the defendant notwithstanding the abnormal event, that *defense* fails. This is true whether the negligent omission be called concurring negligence or not."

In Jackson v. Wisconsin Tel. Co. 88 Wis. 243, 253, 60 N. W. 430, 432, 26 L. R. A. 101, the court said:

"The further argument is made that the stroke of lightning was the 'act of God,' for which no one is responsible. Certainly a stroke of lightning is an 'act of God;' but that is not the question here presented, or rather another element—i. e. the negligence of man—is added to the question, which materially alters its scope."

In Kindell v. Franklin Sugar Ref. Co. 286 Pa. 359, 363, 133 A. 566, 568, the court tersely observed:

"* * * He whose negligence joins with the act of God in producing injury is liable therefor: * * *."

In 38 Am. Jur., Negligence, § 65, the text reads:

"The view that where a natural force or act of God unites with human negligence in causing injury the negligence of the human agent is regarded as a condition, and not as a cause of the injury, is disapproved generally. The general rule is that when the negligence of a responsible person concurs with an ordinary flood, storm, or other natural force, or with a so-called act of God, in producing an injury, the party guilty of such negligence will be held liable for the injurious consequences, if the injury would not have happened except for his failure to exercise care. Reducing the principle to the terseness of a maxim, 'he whose negligence joins with the act of God in producing injury is liable therefor.' * * * Thus, a person whose negligence is the primary cause is not excused because a stroke of lightning intervenes to precipitate an injury. It has been decided that where an injury is attributable to two causes, both proximate, one the result of negligence and the other not, and the injury would not have occurred except for the negligent act, the party who is guilty of the negligent act or omission will be held liable."

■ In our opinion, the court erred in its charge to the jury. The other questions raised by plaintiff need not be considered. Judgment reversed and new trial granted.