SMITH v. BOARD OF COUNTY ROAD COMMISSIONERS
OF CHIPPEWA COUNTY

OPINION OF THE COURT.

1. TRESPASS—DEFENSES—ACT OF GOD.

A defendant is not liable in trespass if the sole cause of plaintiff's injury was an act of God, but defendant is liable if the act by him concurred with an act of God to injure the plaintiff.

2. SAME—DEFENSES—ACT OF GOD—QUESTION FOR JURY.

Decision whether an act of God in the form of abnormally heavy rainfall was the sole cause of plaintiff's injury or whether an act by defendant road commissioners in altering grade and level of a county road which caused a large reservoir of water to be impounded until it broke through another impounding road and washed away support of plaintiff's summer residence was a contributing and concurring cause of the injury was properly left to the jury when it was left in question by the proofs.

DISSENTING OPINION.

BLACK and T. M. KAVANAGH, JJ.

3. TRESPASS—DEFENSES—VIS MAJOR.

*The defense of* vis major, *or act of God, in an action for trespass applies only to a loss that results immediately from a natural cause without the intervention of man and could not have been prevented by the exercise of prudence, diligence, or care.*

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 3–5] 1 Am Jur 2d, Act of God §§ 2, 3.
Determination of quantum of damages for injury to property recoverable against defendant whose wrong concurred with act of God. 112 ALR 1084.
[2] 1 Am Jur 2d, Act of God § 5.
[6, 7] 56 Am Jur, Waters § 167.

4. SAME—DEFENSES—ACT OF GOD—BURDEN OF PERSUASION.

*Act of God, or vis major, is not a valid defense in a trespass action unless the act of God was the sole cause of the injury, and the burden of persuasion of this defense is on the defendant.*

5. SAME—DEFENSES—ACT OF GOD—BURDEN OF PERSUASION—CONTRIBUTING CAUSES.

*Defendant did not meet the burden of proving its contention that flood damage to plaintiff's property was solely the result of an act of God where the evidence showed that before defendant did work on a certain road, water that gathered in a low lying area next to the road could drain off by flowing over the road, but after defendant raised the grade of the road this avenue of escape was cut off and excess water was trapped, despite the installation of a larger culvert under the road, with the result that parts of the road washed out and plaintiff's property suffered water damage; therefore plaintiff was entitled to a peremptory instruction of liability because defendant's acts were in law a contributing cause of the damage.*

6. SAME—IMPOUNDED WATER—EVIDENCE—DUTY TO PROVE NEGLIGENCE.

*Plaintiff need not aver and prove negligence by defendant in order to establish a prima facie case of liability for trespass in a case in which waters, impounded as a result of acts of defendant, damaged plaintiff's property when they escaped.*

7. TRIAL—EVIDENCE—INSTRUCTIONS TO JURY.

*Directed verdict for plaintiff on issue of defendant's liability is mandatory in a trespass action for flood damage caused by escaping waters impounded by defendant's road building where the burden was on the defendant to prove its affirmative defense and there was no evidence on which the jury could find that this burden was met.*

Appeal from Court of Appeals, Division 3, Burns, P. J., and T. G. Kavanagh and Fitzgerald, JJ., affirming Chippewa, Baldwin (George S.), J. Submitted June 12, 1968. (Calendar No. 8, Docket No. 51,718.) Decided October 21, 1968. Rehearing denied February 3, 1969.

5 Mich App 370, affirmed.

Declaration by Hal Smith against the Board of County Road Commissioners of Chippewa County for damage from impounded water which broke through roadway and destroyed plaintiff's summer home on May 3, 1959.  Judgment for defendants. Affirmed by Court of Appeals.  Plaintiff appeals. Affirmed.

*Platt & Platt (Plunkett, Cooney, Rutt & Peacock* and *Jeanette A. Paskin,* of counsel on application for rehearing), for plaintiff.

*Burney C. Veum (Thomas J. Veum,* of counsel), for defendant.

DETHMERS, C. J.    Plaintiff claims damages for defendant's trespass upon and flooding his property. Defendant raises as defense an act of God.  The main question in the case is whether that defense was properly left to the jury as a question of fact.

A low area or basin, about five acres in size, was surrounded by roads on the west, north, and east sides.  To the south was a hill and an area of several hundred acres which drained into the five-acre basin.

For years prior to 1957 water accumulating in the basin each spring from thawing snows and rains escaped through an 18-inch culvert under the west road and flowed over the top of that road to a depth of from 12 to 14 inches and in a stream of from 40 to 50 feet in width, often continuing thus for several days.

In 1957 defendant replaced the 18-inch culvert with a 24-inch culvert and raised the level of the west road in that area by several feet.  Thereafter, water no longer flowed across that road as before.

There are proofs in support of the following: In the spring of 1959 an extraordinarily heavy rainfall occurred and the basin filled with water nearly to

the top of the raised west road. The unusually large accumulation of water in the basin caused a breakthrough and washout through the east road. The flow of water from that opening turned north beyond the east road and rushed down toward Lake Superior. In so doing it poured over plaintiff's property and gouged out a large ravine near his summer residence into which the house collapsed with plaintiff and several people in it. The damages resulting from this occurrence are the basis for this action.

At the conclusion of proofs for both sides, plaintiff moved for a directed verdict for plaintiff on the question of liability with the amount of damages to be left to jury determination. Plaintiff also submitted requests to charge, including one which amounted to a request for such directed verdict. These the trial court refused.

The defendant having claimed that plaintiff's injury was due to an act of God, namely, a torrential rainfall, the court instructed the jury on that subject, defining an act of God in legal contemplation and stating the circumstances under which it was available as a defense. The court made it clear that if an act of God occurred which was not a superseding, supervening force, obliterating all other causes brought about by defendant, then defendant would be liable, but, if there had been an act of God, which was the sole cause of the disaster and the latter was not contributed to by acts or inaction on defendant's part, then defendant would not be liable. There was no complaint on plaintiff's part at trial nor on appeal as to the correctness of the court's charge on this subject, but only that it should not have been given at all.

In this case plaintiff cites cases for the proposition that when an act of defendant concurs with an

act of God as a cause of the injury, defendant is liable; that an act of God is a defense only if it is the sole proximate cause of the injury.[*]   Plaintiff then insists that under the proofs here there can be no question but that defendant's action in raising the west road was, as some testimony indicates, a concurring cause of the injury, without which it would not have happened despite the unusual rainfall, and, therefore, defendant should be held liable as a matter of law.

Defendant relies on *Golden & Boter Transfer Co.* v. *Brown & Sehler Co.* (1920), 209 Mich 503, as holding, under the proofs in that case, that the question of an act of God was a question of fact for the jury. Defendant then quotes from the opinion of this Court in that case, as approving the quotation therein contained from the instructions of the trial court, as follows (pp 509, 510):

" 'Now if you find that the sole cause of the falling of the wall was an extraordinary wind storm, such a wind storm as our experience in this locality would not lead us to anticipate, your verdict should be for the defendants, a verdict of no cause of action, for the falling of the wall from such a cause would be what is termed an act of God. I am going to repeat that to you again so that we will make no mistake about your getting it. If you find that the sole cause of the falling of the wall was an extraordinary wind storm, such a wind storm as our experience in this locality would not lead us to antic-

---

[*] *American Coal Co.* v. *De Wese* (CA 4, 1929), 30 F2d 349; *Jackson* v. *Wisconsin Telephone Co.* (1894), 88 Wis 243 (60 NW 430); *Zollman* v. *Baltimore & O. S. W. R. Co.* (1918), 70 Ind App 395 (121 NE 135); *Chidester* v. *Consolidated Co.* (1881), 59 Cal 197; *City of Piqua* v. *Morris* (1918), 98 Ohio St 42 (120 NE 300); *Inland Power & Light Co.* v. *Grieger* (CA 9, 1937), 91 F2d 811; *Sauer* v. *Rural Co-op Power Association* (1948), 225 Minn 356 (31 NW2d 15); *Williams* v. *Columbus Producing Co.* (1917), 80 W Va 683 (93 SE 809); *Tobin* v. *Lake Shore & M. S. R. Co.* (1916), 192 Mich 549; *Klawinski* v. *Lake Shore & M. S. R. Co.* (1915), 185 Mich 643; *LeVasseur* v. *Allen Electric Co.* (1953), 338 Mich 121.

ipate, your verdict should be for the defendants, a verdict of no cause of action, because the defendants would not be required by the law to guard against such an extraordinary storm as I have just been speaking of, for the falling of the wall from such a cause would be what is termed the act of God. By the term "act of God" is meant those events and accidents which proceed from natural causes and cannot be anticipated and provided against, such as unprecedented storms, or freshets, lightning, earthquakes, et cetera. For a loss occasioned by the act of God, as I have defined it, the defendants would not be responsible. If the sole cause of the falling of the wall was an act of God, I said the plaintiff cannot recover.' "

There was testimony here to indicate, or from which it might be inferred, that but for the unusual rainfall here involved the accident and injury would not have occurred.

The trial court was of the view that the proofs left the questions of whether there had been an act of God which caused plaintiff's damages and whether it was the sole cause, or whether defendant's change of the grade and level of the west road was a contributing and concurring cause thus rendering it liable despite the act of God, as questions of fact for jury determination. With that view the Court of Appeals concurred and affirmed the jury's verdict of no cause for action. We do likewise.

Affirmed. Costs to defendant.

KELLY, O'HARA, and T. E. BRENNAN, JJ., concurred with DETHMERS, C. J.

BLACK, J. *(dissenting)*. This case calls into exemplary play an ever-reliable adage of the bench that all evidentiary facts and admissions should be

arrayed and carefully ascertained before the seated jurist or jurists attempt to fit any rule of law to their forthcoming judgment.

"More and more, we lawyers are awaking to a perception of the truth that what divides and distracts us in the solution of a legal problem is not so much uncertainty about the law as uncertainty about the facts—the facts which generate the law. Let the facts be known as they are, and the law will sprout from the seed and turn its branches toward the light." (Cardozo, J., quoted in *Ruediger* v. *Klink* (1956), 346 Mich 357, 371).

The action is for trespass, not for negligence as in *Golden & Boter Transfer Co.* v. *Brown & Sehler Co.* (1920), 209 Mich 503, upon which the panel below relied (5 Mich App 370, 373). That was settled when *Herro* v. *Chippewa County Road Commissioners* (1962), 368 Mich 263, an action founded upon the same liability facts and issues as are now before us, came to decision in 1962. The critical difference is that in the *Golden Case* the plaintiff bore the burden of proving that the defendant was causally negligent, whereas here the defendant carried the burden of proving that it did nothing of concurrently causative force.

The unamended pretrial summary considered (GCR 1963, 301.3),[1] the only liability issue left was presented by defendant's affirmative plea that the damages suffered by plaintiff were caused exclusively by a *vis major*.[2] By that plea the defendant

---

[1] Under "Admissions and Issues" the trial judge's pretrial summary proceeds:

"It is admitted that on or about 6:00 a.m., May 3, 1959, the water in the impounding between Ranger, Lake Shore and Tower roads in Chippewa county gave way and that the water flooded the property on which the plaintiffs were located, and that this flooding resulted in the property damage, injuries and death alleged in the various cases."

[2] As I read the various texts and definitions the defense of *vis major* applies only to a loss that results immediately from a natural

undertook an extraordinarily heavy burden, that of adducing proof which would justify a verdict that the breakthrough of the water impounded south and east of the involved county roads was caused solely by the Creator. For reasons now to appear, we hold that the defendant did not support that burden with proof sufficient to warrant a negative verdict and that the plaintiff was entitled to grant of his request for a peremptory instruction of liability.

What was done and not compensatorily done by defendant in the years 1957 and 1958, distinguished from the disastrous flood of May 3, 1959, is determinative of the pleaded question of sole causation. The effective damming then by defendant, of the watershed now to be described, constituted in law a continuing and hence contributory cause of the 1959 washout of Tower road and Lake Shore drive and of the resultant cascade which destroyed the plaintiff's cottage; hence, the rule of *Stone* v. *Roscommon Lumber Co.* (1886), 59 Mich 24, 31, applies here. That case involved the damming by the defendant of the Muskegon river near Houghton Lake with result of flooding of the plaintiff's lands and action to abate the dam and for damages.

"The fact that natural causes contribute, with the unlawful acts complained of, in producing the injury, does not relieve from liability to the injured party: *Salisbury* v. *Herchenroder* (1871), 106 Mass 458; *Dickinson* v. *Boyle* (1835), 34 Mass (17 Pick) 78; *Woodward* v. *Aborn* (1853), 35 Me 271; *Pittsburgh* v. *Grier* (1853), 22 Pa St 54; *Scott* v. *Hunter* (1863), 46 Pa St 192; *Polack* v. *Pioche* (1868), 35 Cal 416."

---

cause without the intervention of man and could not have been prevented by the exercise of prudence, diligence, or care. See Black's Law Dictionary (4th ed, 1951), p 1743.

To apply the proofs to defendant's plea of exclusively celestial causation one should scrutinize first the topography of the area where the damaging events took place, as those pertinent circumstances should have been considered by the defendant when its work crew undertook in 1957 to raise the grade of Ranger road at the point where that road crossed nature's southwestward veering ravine of drainage. These pre-1957 facts appear without dispute in exhibits 86, 123, and 129. Exhibits 86 and 129 are 1951-prepared topographic maps furnished by the Corps of Army Engineers for the Department of Interior. Exhibit 123 is the defendant's 1956 published Chippewa county road map.

Visualize a 600-acre drainage area lying mostly in one of 4 adjacent sections and fractional sections of land. That one section is No. 19. It lies immediately south of one of the 2 fractional sections, No. 18. Fractional section 18 separates, by a few hundred feet only, measured north from the northwest corner of section 19, the northeasterly-southwesterly bearing shore of Lake Superior from said section 19. Plaintiff's cottage was situated in fractional section 18, not far from that shore.

The drainage area was and yet is enclosed generally on the west by the grade of section 19's western section line highway (Ranger); on the north by the grades of two highways, one being a northeasterly-southwesterly bearing highway (Lake Shore drive) and the other being presently described Tower road; and on the south and east by the heights of a long wooded ridge extending northeasterly across section 19 and fractional section 18 toward Lake Shore drive. The top of this ridge is at least 160 feet above the bottom of the former and present culverts under Ranger road, a fact which gives some idea of the rapidity of water runoff

from the watershed when the late spring breakups typical of the northern peninsula take place.

A third highway was involved in the topographic situation of 1957 as well as in the damaging washout of 1959. It is Tower road, forming the north section line of section 19. Tower and Ranger end where they intersect at the northwest corner of section 19. Both were opened as highways long before Lake Shore drive was constructed by the WPA in the 1930's. The latter highway, bearing northeasterly-southwesterly as we have seen, crosses Ranger and Tower a few hundred feet south and east of the intersection of those two roads, leaving a triangle of highways in the extreme northwest corner of section 19. The result, both by nature and highway construction and maintenance prior to 1957, was an effective natural barrier against drainage of the 600-acre watershed northerly or northeasterly toward Lake Superior.

This brings us to a comprehensive view of nature's method of draining the watershed. Starting in the southwest quarter of section 19, exhibits 86 and 129 show a well-defined natural stream bed which proceeds north in the westerly part of section 19 to a point just south of the intersection of Lake Shore with Ranger. There it turns under Ranger and proceeds southwesterly and parallel to the southerly side of Lake Shore drive to and into inland Pendills lake. That lake drains into Lake Superior some 4 miles southwest of section 19.

Prior to 1957 this natural drain of the watershed was impeded only by the original low grade of Ranger road where that grade crossed the ravine of the stream bed. The testimony shows without dispute that the township authorities had originally provided a wooden culvert under this grade for the purpose of carrying the normal drainage of the

watershed along its natural course, and that some years later a metal culvert of approximately the same capacity (18 inches in diameter) was installed without, at the time, raising of the grade at such low point.

Prior to 1957, and in times of excessive rainfall and melting of snow, the excess water from the 600-acre drainage area spilled over the surface of Ranger road in the vicinity of the culvert, sometimes "2 feet or so deep in the middle and 100 feet wide running over the road." The situation was such, however, that the steep hill leading south on Ranger from the location of the culvert was occasionally difficult for vehicular travel. Also, it provided a limited and hence unsafe view for motorists driving toward the crest of the hill from opposite directions. These were the fully understandable reasons assigned for the Ranger road improvement which the defendant undertook in 1957.

The 1957 improvement consisted of cutting the crest of the hill to some extent and elevating the grade of Ranger road to a height of 8 measured feet above the bottom of the stream bed.[3] At the same time a new 24-inch culvert was installed in the place of the former 18-inch culvert, supposedly to compensate for the elimination of the unrestrained and unlimited spillway which the former low grade of Ranger provided. That compensation was far from enough. Undisputed testimony, some

[3] A farmer and cattleman whose acreage drained into the section 19 basin had lived in the area some 40 years prior to the time of trial. He testified without dispute that the pre-1957 surface of Ranger road at the point in question was "about 2–1/2 feet above the swamp." Thus the surface of Ranger road, after the 1957 project was completed with blacktopping in 1958, was at least 5–1/2 feet above the former surface. Also without dispute this witness testified that the night before the breakthrough on May 3, 1959, he went down to the scene of the 1957 project and found that the water in the impound was within "6 to 8 inches, almost to the top," of the new height of Ranger road.

of which was provided by defendant's said expert witness, showed that very clearly.

The only witnesses testifying for defendant who knew anything about the planning and actual doing of the 1957 Ranger road job were Everett Clegg and Irvin Deuman. Mr. Clegg was superintendent of construction and maintenance of roads that were under the jurisdiction of the defendant board. Mr. Deuman was defendant's foreman in charge of the Ranger road job. It developed in the course of their testimony that no plans or specifications for the job had been made, that the board did not have a road engineer engaged or otherwise on the job at the time, and that no engineering or corresponding check was made of the effect of raising the grade of Ranger upon necessary drainage of the area in question. Mr. Clegg testified connectedly to the point:

"*Q.* At the time this Ranger road was raised you were the superintendent and I presume you had charge of the people?

"*A.* Yes.

"*Q.* Were there any plans or specifications ever drawn up, blueprints, anything in writing whatsoever as to what you did to Evans Hill or how high you would raise Ranger road?

"*A.* No.

"*Q.* I believe you told me the men was working there and they took out some of the bad material and were filling it in and you would drive by once in awhile and check the work and when you felt it was high enough you told them that would do and while you were there you changed from an 18-inch to a 24-inch culvert and I believe you told me you laid a 24-inch culvert in the bed of the stream?

"*A.* Yes.

"*Q.* And that's the natural drainage of that area?

"*A.* Yes.

"*Q.* Did you take any actual measurements as to the height you raised Ranger road?

"*A.* No. I stood on the culvert——

"*Q.* You told us that. I believe the testimony is that the measurement of the road was 8 feet from the bottom of the culvert and if the culvert would be in the bottom and the culvert is 2 feet that would mean the road is 6 feet above the top of the culvert, would you say that Mr. Sainio's figures were reasonably accurate?

"*A.* Yes, I would say so.

"*Q.* Now at the time you decided to change from an 18-inch culvert to a 24-inch, you made that decision?

"*A.* Well, that's customary for our cross road culvert and one thing about a 24-inch culvert it carries pretty near twice as much water, plus it don't block up near as fast as an 18-inch culvert.

"*Q.* Did you or anyone else make any study to determine whether it would carry off enough water?

"*A.* No.

"*Q.* Did you check for any high water marks in the basin, are you familiar with Henry Shield's farm, that's all extremely high ground?

"*A.* I've been there.

"*Q.* I believe you testified you have driven Ranger road many times and as you are driving south or north on Ranger up to Evans place on the right or east you see this drainage basin here, don't you?

"*A.* Yes.

"*Q.* It comes around back of his place and runs west down into Pendills lake, did you check that area to see how much water would go through there?

"*A.* No.

"*Q.* You are familiar with the snows and the sudden and rather severe thunder storms, it rained pretty hard didn't it?

"*A.* Yes, it didn't last too long.

"*Q.* But it was a real, real hard, heavy rain, wasn't it?

"*A.* Yes.

"*Q.* With lots of electrical—lightning and thunder?

"*A.* Yes.

"*Q.* So being familiar with that you didn't take any precautions whatsoever or make any study at all?

"*A.* No.

"*Q.* Now after this washout broke out through Tower road, did you replace the culvert with a larger one?

"*A.* No."

Mr. Deuman testified:

"*Q.* Well, let's get to this culvert on Ranger road, you were the foreman in charge?

"*A.* Yes.

"*Q.* As to this culvert that was to go in there, there was an 18-inch and you replaced it with a 24-inch there in the stream?

"*A.* Yes.

"*Q.* Did you talk with any of the natives in the area as to its history?

"*A.* No.

"*Q.* Did you walk back in the swamp?

"*A.* No.

"*Q.* Did you have any plans, specifications, or drawings as to size and of this Ranger road improvement?

"*A.* No.

"*Q.* You just did it by sight of eye and practical experience?

"*A.* Yes."

Applying recognized engineering practices and referring to standard highway department specifications, the respective engineer-witnesses were not far apart in testifying that the Ranger road elevation called for a culvert much larger than the 24-

inch tube defendant installed. Plaintiff's experts testified that, to accommodate the new situation, a culvert diametered between 66 and 78 inches was indicated. Defendant's expert, Mr. Scott, placed the diameter at "a 60- or 70-inch culvert." So the best that may be said for defendant's proofs is that they established the before and after 1957 situation this way:

The pre-1957 culvert and the unrestricted spill-way over the then low surface of Ranger road did not, because they could not, materially impede the natural drainage to southwestward of section 19's watershed, no matter the volume and rapidity of precipitation and runoff into that watershed. The more and faster the runoff, the higher and wider the spillway. But with the dam at Ranger road constructed, there being no adequate culvert below and no compensatory raising of the height of Tower road, defendant's dam created a continuing peril of dangerous washout to the north when no such peril existed before, a peril which materialized when the torrential rains and melting of snow in the spring of 1959 raised the level of the dammed water to such height that it finally broke through to Lake Superior in another direction, a direction near opposite that which exhibits 86 and 129 show Dame Nature provided to carry unlimited quantities of water from section 19 into the Pendills lake drainage basin.

The trial judge, instructing the jury under the heading "undisputed facts," delivered a comprehensive summary of the testimonial facts which the writer has related in somewhat greater detail. The facts thus detailed and summarized dictate the legal conclusion reached in the fourth paragraph of this opinion. The judge's summary follows:

"There are certain undisputed facts and propositions in this case. It is undisputed that the defendant had control of the roads at the points in question, and maintained and were under a duty to maintain those roads and to see that their methods of maintenance did not endanger other persons or property. Under certain circumstances they were required to employ an engineer.

"The second undisputed fact is that the natural drainage at this intersection was about a mile square or over southeast of the intersection of Tower and Ranger roads, and that the natural drainage was to the west through or over Ranger road and not over Tower road.

"Third, it seems to be undisputed that prior to 1957, spring floods did spill over Ranger road, although one of the witnesses testified that he had not seen it. No damage was done because it spilled into a creek, it did not gouge out Ranger road, it went finally into Pendills lake and into Lake Superior.

"There is no dispute that Ranger road was raised several feet in 1957 and that a 24-inch culvert was substituted for the 18-inch culvert, and there is no dispute about the fact that Ranger road, when finally completed, was about 2 feet higher than Tower road.

"It seems to be undisputed that this raising of the road did create an artificial reservoir by impounding the waters and this case is to be treated in the same way as though there was an intended reservoir there because the net result of the act was to create an artificial reservoir.

"It is an incontrovertible physical fact that if spring flood waters arose in this new basin and if the new culvert could not handle them, then all other things being equal if Ranger road did not give way, the waters would spill over Tower road, a 2 foot lower road. You can assume that as a matter of physical fact.

"It seems to be undisputed that on May 3, 1959, the waters in this Ranger basin did not spill over Ranger road before this occurrence of the gouging on Tower road, and only went through Ranger road when it was bulldozed to relieve the Tower road calamity."

*To Conclude:*

1. When the taking of testimony in this case began, the plaintiff stood before the court and jury possessed of a *prima facie* case of liability against the defendant. See *Robinson* v. *Township of Wyoming* (1945), 312 Mich 14; *Rylands* v. *Fletcher* (1868), LR 1 Exch 265, LR 3 HL 330, 4 Hurlst & C 263, 1 Eng Rul Cas 236, and discussion of the latter in 38 Am Jur, Negligence, § 139, pp 799–801 and 56 Am Jur, Waters, § 167, pp 634, 635.

2. That *prima facie* case was not met or rebutted in any way by defendant. Instead, its proofs tended only to establish that the successive washouts of the 2 county roads and the consequent destruction of plaintiff's property were due to two proximately concurring causes, one actionable against it and the other nonactionable. One was a carelessly conceived and executed project of damming nature's drainage outlet without providing some adequately compensatory spillway or sluice for excess flow into that outlet. The other was an act of God. The legal result was that the 2 causes cooperated in forcing the variously estimated 5 to 12 acre impound of water over and then through the lowest and more easily eroded gravel surface of Tower road.

3. Applying the familiar "but for" test, one need only inquire whether this unnatural breakthrough in a northerly direction would have occurred but for (a) defendant's damming of nature's deep and manifestly adequate ravine of drainage which led

and still leads off to the southwest, and (b) but for defendant's failure to counter-elevate and counter-strengthen[4] the grade of Tower road in the area of breakthrough. The answer is that there is no proof or permissible inference from proof, not even an opinion (assuming any such would have been admissible without supporting facts) of defendant's highly competent expert witness, which might justify an affirmative answer. The determinative evidentiary reason is that, before defendant elevated Ranger road in 1957 in the manner testified by its witnesses Clegg and Deuman, nature and the then low grade of Ranger provided a limitless spillway and outlet for excess water draining into the section 19 basin.

4. The rule of *Rylands* v. *Fletcher,* followed here, is one of strict liability. But it is not absolute. The trespassing defendant may, if he can, plead and prove that the sole cause of the plaintiff's grievance was an actionable or nonactionable act or omission of a third party or of the Supreme Being. Here the defendant was unable to make out a submissible case of exclusive causation since its dam, a more or less permanent obstruction of nature's way, was bound to be a contributing cause of any dangerous rise of water in the impound, no matter the intensity or continuity of nature's deluge.

5. On a number of occasions in recent years we have deemed it advisable that reference be made back to *Carver* v. *Detroit & Saline Plank Road Co.* (1886), 61 Mich 584, so far as that case deals with the respective functions of judge and jury when a motion for peremptory instruction is presented. The first of these occasions appears in *Kaminski* v. *Grand Trunk W. R. Co.* (1956), 347 Mich 417, 419, 420;

---

[4] By blacktopping any such new surface, the same as was done to the new surface of Ranger road in 1958.

the latest in *Cummings* v. *Grand Trunk W. R. Co.* (1964), 372 Mich 695, 698.   In *Carver,* 592, the Court by adopted quotation made it clear that the duty of the judge is the same when the *defendant* bears the burden of proof as when the *plaintiff* carries that burden:

"There is, in every case, a preliminary question, which is one of law, viz., whether there is any evidence on which the jury could properly find the verdict for the party on whom the *onus* of proof lies.   If there is not, the judge ought to withdraw the question from the jury, and direct a nonsuit if the *onus* is on the plaintiff, or direct a verdict for the plaintiff if the *onus* is on the defendant."

Here the *onus* was on the defendant board from the beginning.   The board failed to sustain it.   That being so, the duty of the trial judge was that of peremptory instruction according to plaintiff's motion.

There was no room here for a finding or verdict that the acts and omissions of defendant were not contributorily causative, no matter the extent or violence of the rainfall and runoff of April and early May of 1959.   We therefore vote to reverse and remand for trial of the issue of damages only and for entry of final judgment accordingly.   Plaintiff should have costs of all 3 courts.

T. M. KAVANAGH, J., concurred with BLACK, J.