**CONTINENTAL CASUALTY COMPANY OF ILLINOIS, Subrogee of WJRT, Inc., Ohio Farmers Insurance Company, an Ohio corporation, and Phoenix Assurance Company, a New York corporation, Subrogee of Charles and Larue Pemberton, Plaintiffs,**

**v.**

**WESTINGHOUSE ELECTRIC CORPORATION, and Edwin L. Wiegand Corporation, jointly and severally, Defendants.**

**Civ. A. No. 29951.**

United States District Court,
E. D. Michigan, S. D.

March 13, 1970.

See also, D.C., 327 F.Supp. 723.

---

Kenneth C. Davies, Lawrence H. Rudzki, Davies, Rudzki & Zeder, Detroit, Mich., for Continental Casualty Company of Ill.

Rodman C. Moesta, Johnson, Campbell & Moesta, Detroit, Mich., for Ohio Farmers Insurance Co., Phoenix Assurance Company.

Konrad D. Kohl, Davidson, Gotshall, Kohl, Nelson, Secrest, Wardle & Lynch, Detroit, Mich., for Westinghouse Electric Corporation.

Buell A. Doelle, Vandeveer, Doelle, Garzia, Tonkin & Kerr, Detroit, Mich., for Edwin L. Wiegand Corp.

## OPINION

ROTH, District Judge.

This is a subrogation action by three plaintiff insurers against two defendants, Westinghouse Electric Corporation and Edwin L. Wiegand Corporation (hereinafter referred to as Westinghouse and Wiegand), to recover moneys paid by them as a result of a fire at WJRT–TV, a television station with related offices, located at Flint, Michigan.

The two-count complaint pleads breach of express and implied warranties and negligence of both defendants in furnishing WJRT–TV a heating-air conditioning unit manufactured by Westinghouse, containing a component heating element manufactured and supplied by Wiegand—which heating-air conditioning unit caused the fire and consequent losses complained of.

There are certain undisputed facts: Westinghouse manufactured and sold the combination heater-air conditioner unit, which was installed in a secretary's office in a newly constructed administrative wing at WJRT. (Fifteen other like units were installed in the building.) One of the component parts of the unit was a 3,000 wattspiral electric resistance heater, manufactured by Wiegand and sold to and installed by Westinghouse in the unit in question. The said unit was installed under the window in the room, which was used principally as a storeroom and which was not occupied by anyone until the week preceding the fire. The fire occurred at about 8:00 a. m. on Saturday, March 5, 1966. During that work week, i. e., Monday through Friday, March 4, the room was used by an accountant; Friday, he left the room at approximately 5:30 to 6:00 p. m.

It is stipulated that Charles and Larue Pemberton owned the building occupied by WJRT–TV as tenant; that plaintiffs are possessed of the subrogation rights; and, that the amounts paid by the plaintiffs are as follows:

Continental Casualty Company ...... $205,083.68
Ohio Farmers Insurance Company .... $ 33,309.99
Phoenix Assurance Company ........ $ 8,882.66

It is further stipulated that if plaintiffs are entitled to recover, they are entitled to recover in the amounts stated.

The parties are agreed that there was arcing in the heating element manufactured by Wiegand. The dispute between the parties centers on what caused the fire and, by the same token, what caused the arcing.

It is the theory of the plaintiffs, joined by Westinghouse, that the heating element manufactured by Wiegand was defective when delivered to Westinghouse by reason of a defective or "marginal" weld of an end pin and the heating wire, or that there was present some foreign material in the area of the weld. They contend that because of the defective weld or foreign substance an internal arc developed at the weld, generating a tremendous amount of heat and energy within the sheath, causing a breakdown of the magnesium oxide insulation so that the arc reached the sheath, causing the expulsion of extremely hot gasses and molten metal particles, which then came into contact with the polyurethane filter, igniting the same and causing the ensuing fire damage.

It is the theory of the defendant Wiegand that Westinghouse was negligent in the design and manufacture of the unit in the following respects: that it improperly employed a flammable polyurethane filter; that it utilized flammable ABS plastic in its grilles; that the air flow over the thermostatic sensing bulb was restricted; that the chamber of the unit was improperly designed; and, that the over-temperature limit switch was improperly located upstream of the heating element. From these premises Wiegand reasons that the fire originated external to the heating element; that the limit switch was defective and did not work, as a result of which intense heat was generated causing the arcing; and, that the arcing did not occur at the weld.

There was considerable dispute as to whether the drapes, which could be drawn across in front of the unit, were in a closed position. Under the evidence we conclude that they were open at the time of the fire. As for the limit switch, we conclude that it was in work-

ing order, especially in view of the fact that months later, it responded to tests at Chromalox Laboratories, albeit at a higher calibration than would have been normal. If an external fire had caused the heating element to rupture, and we speak now of a buildup of some 1600 degrees, there would have been severe damage evident in the control panel. There was, however, no damage inside the control panel, located immediately to the left of the heating chamber: the paper diagram of the wiring circuitry is intact, with a slight browning along the right side thereof; there is no damage to the wiring in the control area; and, there is no evidence of melting or burning of bakelite parts, or of the aluminum face plate.

The x-rays of the cold pin and the heating wire near the rupture or eruption point indicate that a part of the weld portion of the heating wire is missing. With regard to this weld, defendant Wiegand's proofs were to the effect that the heating wire and the cold pin were brought together by a spot weld. This part of the manufacturing process was performed manually by an operator working on a normal production schedule of 400 welds per hour. Only one out of each hundred heating elements was subjected to a pull test.

The probabilities are, on the evidence before us, that the spot weld, connecting the heating wire to the cold pin, was defective on the unit in question, and we so find. We further find that because of the defective weld an arcing developed inside the sheath, leading in turn to a rupture of the sheath and the expulsion, at high velocity, of particles of molten metals, hot magnesium oxide and gasses which, coming into contact with the polyurethane filter and the plastic grille, caused them to burn, setting fire to the drapes and, by progression, the other material in the room and building.

■ On the evidence we hold that the conduct of Wiegand was the primary and efficient cause of the injury, i. e. that it was the sole, primary and proximate cause of the fire.

With respect to Westinghouse, we hold that it was its duty to use due care in constructing the unit and to see to it that it was properly equipped so that it could safely be used for its intended purpose and would not be a menace to those who used it. While we hold that the defect in the heating element supplied by Wiegand was not such as to have been discoverable by the exercise of due care by Westinghouse and that, therefore, its failure to discover the defect was not negligence, we conclude, under the authority of the leading Michigan case on the subject, Piercefield v. Remington Arms Co., 375 Mich. 85, 133 N.W.2d 129, that Westinghouse is liable to the plaintiffs for breach of implied warranty of the unit of its fitness for its intended purpose and use.

Under *Piercefield* the burden is upon the plaintiffs in a case like this to "prove (a) the defect of manufacture upon which he relies, and (b) injury or damage caused by or resulting from such defect." In *Piercefield* the Court cited Picker X–Ray Corp. v. General Motors Corp., D.C.Mun.App., 185 A.2d 919. We quote from that case, what we consider applicable here:

> " * * * Implied warranty recovery is based upon two factors: (a) The product or article in question has been transferred from the manufacturer's possession while in a 'defective' state, more specifically, the product fails either to be 'reasonably fit for the particular purpose intended' or of 'merchantable quality', as these two terms, separate but often overlapping, are defined by the law; and (b) as a result of being 'defective', the product causes personal injury or property damage."

We consider Michigan, in *Piercefield,* to have adopted the strict tort doctrine under the guise of the implied warranty theory. See Wayne Law Review, Vol. 15, page 1558. We hold that the plaintiffs have carried the burden of proof on the claim of implied warranty as to each defendant and on the claim of negligence as to the defendant Wiegand.

Under the above findings of fact and conclusions of law we hold that plaintiffs are entitled to recover from both defendants in the amounts stipulated, together with interest at the rate of 5% per annum from May 18, 1967 to the date of entry of judgment.

This resolves the issues between the plaintiffs and the defendants. There remain the cross-claims of the defendants. These will be considered and resolved upon motions or trial as may be found appropriate.