GUTOWSKI v M & R PLASTICS & COATING, INC.

1. WITNESSES—EXPERT WITNESSES—IMPEACHMENT—BIAS—NEGLI-
GENCE ACTIONS.

Impeachment of a witness by showing interest or bias is proper
and, therefore, no error was committed where defense counsel
stated during opening argument that plaintiff's medical expert
testified frequently for plaintiff's law firm in workmen's com-
pensation cases.

2. PRODUCTS LIABILITY—NEGLIGENCE—ADEQUACY OF WARNINGS—
JURY QUESTION.

The adequacy of directions for use and warnings of potential
danger given by a manufacturer who distributes his product for
purchase by the public are usually questions for the jury in a
products liability action.

3. PRODUCTS LIABILITY—NEGLIGENCE—JURY—ADEQUACY OF WARN-
INGS—STANDARD—UNREASONABLE RISKS OF HARM.

The standard by which a jury is to determine the adequacy of
directions for use of a product and warnings of its potential
dangers is the general negligence standard that liability is
created by conduct which falls below the standard established
by law for the protection of others against unreasonably great
risks of harm.

4. NEGLIGENCE—INTERVENING ACTS—THIRD PARTIES—STANDARD—
REASONABLE MAN—HIGHLY EXTRAORDINARY ACTS.

An intervening negligent act of a third person does not become a
superseding proximate cause of an injury if the original actor
should have realized that a third person might so act or that a

REFERENCES FOR POINTS IN HEADNOTES

[1] 58 Am Jur, Witnesses § 674.
[2, 3, 8, 9] 63 Am Jur 2d, Products Liability §§ 53–56.
  Manufacturer's or seller's duty to give warning regarding product
  as affecting his liability for product-caused injury. 76 ALR2d 9.
[4] 63 Am Jur 2d, Products Liability § 173.
[5, 6] 63 Am Jur 2d, Products Liability § 32.
[7, 10] 63 Am Jur 2d, Products Liability § 44.
[11] 5 Am Jur 2d, Appeal and Error § 802.

reasonable man, knowing the situation existing when the act of the third party was done, would not regard it as highly extraordinary that the third party so acted.

5. PRODUCTS LIABILITY—NEGLIGENCE—EVIDENCE—DANGEROUS CHEMICALS—SAFE HANDLING PROCEDURES—KNOWLEDGE—SMALL QUANTITIES.

The exclusion in a products liability case of testimony concerning a defendant's knowledge of proper and safe handling procedures of a dangerous chemical used in making the chemical compound which allegedly caused plaintiff's injury was proper where the issue before the jury was the degree of danger in the compound which contained substantially smaller quantities of the dangerous chemical and therefore would have required a less comprehensive safety procedure.

6. NEGLIGENCE—EVIDENCE—CUSTOM—ACTOR'S LOCALITY—GENERALITY—KNOWLEDGE—NEGLIGENT IGNORANCE—PAST CONDUCT—STANDARD OF CARE.

A custom to be relevant in a negligence action must be reasonably brought home to the actor's locality, and must be so general, or so well known, that the actor may be charged with knowledge of it or with negligent ignorance, and the past record of conduct of one who is alleged to have acted negligently is no evidence of any standard of reasonable care, but when he has departed from it, it may be used against him as indicating his knowledge of the risk and the precautions necessary to meet it.

7. PRODUCTS LIABILITY—NEGLIGENCE—EVIDENCE—DEGREE OF HAZARD—STIPULATION BY OPPOSING COUNSEL.

Counsel for plaintiff is not precluded from detailing the degree of hazard surrounding the use of a chemical compound which allegedly caused injury to plaintiff in a products liability action merely because opposing counsel stipulates that the product has "some health hazard"; a concession on a material issue which fails to cover all of the facets of the issue will not preclude the opposite party's introduction of evidence on the issue.

8. PRODUCTS LIABILITY—NEGLIGENCE—DUTY TO WARN—FORESEEABILITY—ADEQUACY OF WARNINGS.

There is a duty on the part of a manufacturer of a chemical compound to warn of foreseeable injuries, and the adequacy of such warnings, when given, depends upon whether, despite the

warning and instructions, the injury which was sustained was foreseeable.

9. PRODUCTS LIABILITY—NEGLIGENCE—DUTY TO WARN—ADEQUACY OF WARNINGS—WARNINGS TO EMPLOYERS—WARNINGS ON PRODUCT —GRAVE RISK OF DEATH—RISK OF SERIOUS HARM.

A manufacturer-supplier's duty to warn of foreseeable injuries where if his product is ignorantly used by an employee it is very likely to involve grave risk of death or serious bodily harm is not met by merely warning an employer who uses the product, where the product is one which it is practicable to make carry its own warning.

10. PRODUCTS LIABILITY—NEGLIGENCE—FORESEEABILITY OF HARM—DE-GREE OF TOXICITY—DEGREE OF DANGER—EVIDENCE—BURDEN OF PROOF.

The greater the degree of toxicity of a chemical compound, the greater will be the foreseeability of injury to potential users; therefore, a plaintiff who alleges injury because of the failure of the manufacturer to warn of foreseeable dangers is compelled to establish not only that the product is dangerous but is obliged to show the degree of danger.

11. EVIDENCE—IMPROPER EXCLUSION—OTHER EVIDENCE—HARMLESS ERROR.

Error in the exclusion of evidence is not prejudicial where the omitted facts are established by other evidence.

Appeal from Wayne, Charles Kaufman, J. Submitted Division 1 March 5, 1975, at Detroit. (Docket No. 18971.) Decided April 24, 1975.

Complaint by Ronald Gutowski against M & R Plastics & Coating, Inc., for injuries sustained while using a chemical product manufactured by defendant. Judgment for defendant. Plaintiff appeals. Affirmed.

*Ripple & Chambers, P. C.* (by *Sanford L. Steiner*), for plaintiff.

*Lakin & Worsham, P. C.* (by *Sanford N. Lakin*), for defendant.

Before: ALLEN, P. J. and McGREGOR and M. F. CAVANAGH, JJ.

ALLEN, J. This is a products liability case charging that a chemical product manufactured and sold by defendant was defective by reason of inadequate warnings on the label and inadequate instructions on how to use the product in a safe manner. Trial was before a jury which, on November 20, 1973, returned a verdict for defendant. Judgment was entered in accordance therewith, and plaintiff appeals as of right.

Succinctly stated, the facts are as follows: Defendant company, located in St. Louis, Missouri, manufactured a chemical binder called Mistabond which it sold to plaintiff's employer, Polybond Corporation of Detroit, which used the product in the manufacture of foam rubber mattresses. Mistabond is a urethane chemical containing isocyanates, one of which is tolylenede-isocyanate (hereinafter referred to as TDI). It was the presence of TDI which caused Mistabond to be dangerous. Apparently, even after being combined with other products to produce Mistabond, a percentage of TDI vapors would still be given off from the compound. The product was shipped by defendant in 55-gallon drums containing warning labels, one of which, exhibit #1, appeared on the top of the drum and another, either exhibit #2 or #3 (but not both), appeared on the side of the drum.[1]

---

[1] Exhibit #1. "CAUTION—THIS MATERIAL IS TOXIC CONTAINS VOLATILE ISOCYANATES. AVOID BREATHING FUMES. AVOID SKIN OR EYE CONTACT. KEEP CONTAINER CLOSED. KEEP AWAY FROM HEAT."

Exhibit #2. "M-R PLASTICS AND COATINGS, INC.
11460 Dorsett Road.
Maryland Heights, Mo. 63042 St. Louis County,
Telephone 314 291-0525
*Guaranteed Product Uniformity*"

September 4, 1968, plaintiff answered an ad in a newspaper advertising employment in a newly established foam rubber factory. At the time, Polybond was in the preliminary stages of setting up their manufacturing process to produce foam rubber mattresses, the basic manufacturing process being the combining of foam rubber particles with the urethane chemical binder Mistabond to produce bonded foam rubber. September 5, 1968, plaintiff commenced work as a general laborer. In his job, he would take a five-gallon bucket, fill it with Mistabond from the 55-gallon drum, carry the bucket up a flight of stairs to a platform, pour the chemical into a vat to be combined with foam rubber particles, return downstairs and open a chute leading from the vat. The compound would flow down the chute into a form which would then be pressed into a mattress under steam pressure. In this process he was bothered by fumes, and experienced dizziness and headache. He complained to Paul Hansen, his employer and presi-

"URETHANES
EPOXIES
PLASTISOLES
        Mistabond 450# Net
        S-351-F Purple Urethane
CAUTION: CONTAINS ISOCYANATES
Keep container tightly closed until ready to use. Provide adequate ventilation. Avoid breathing fumes. In case of skin contact wash with soap and water. FOR EYES CONSULT PHYSICIAN."

Exhibit #3. "CAUTION:
HAZARDOUS IF ABSORBED THROUGH SKIN OR BREATHED
Avoid breathing vapor
Avoid contact with skin or clothing.
Use only with adequate ventilation;
In case of contact immediately flush skin or eyes with plenty of water for at least fifteen minutes; for eyes, get medical attention. Remove and wash clothing before re-use.
Store in a cool dry place."

dent of Polybond, who told him not to worry but to go outside the plant and walk around after each mattress was made. Plaintiff read the exhibit #1 label warnings on the top of the drums and on six occasions called this to the attention of Hansen, and on two occasions requested a face mask which was not given to him. He admitted that from what he read he knew the fumes were dangerous and should not be inhaled but did not know the meaning of the word "isocyanates". On September 12, 1968, plaintiff went home not feeling well, lost consciousness and was rushed to the hospital where his condition was diagnosed as "acute bronchial asthma secondary to inhalation of tolylenedeisocyanate".

Paul Hansen testified that he had designed and installed the Polybond production system which included a ventilating fan, that the fan was not in operation during plaintiff's period of employment, that when plaintiff was employed, Polybond had been using Mistabond for about three weeks, that he was aware that the use of isocyanates required ventilation, and that plaintiff was hired in the breaking-in stage of production when the ventilating fan was not functioning. He admitted that when plaintiff complained, he informed him not to worry but to go outside from time to time for fresh air. There was also evidence that plaintiff was a heavy drinker and smoker and had chronic bronchitis and pulmonary emphysema prior to employment by Polybond.

Plaintiff's theory of the case was that his injuries came from exposure to TDI, an ingredient of Mistabond, which exposure was brought about by defendant's negligence in failing to adequately warn and inform plaintiff and his employer, Polybond, of the dangers involved in the use of the

product. Specifically, plaintiff claimed defendant should have advised Polybond that inhaling fumes from the product would cause bronchial asthma, bronchitis, and similar respiratory problems and should have advised both Polybond and plaintiff that to avoid the problem, the product should be used in an entirely closed air system or, alternately, if that were not feasible, respiratory equipment such as face masks should be provided. Defendant raised multiple defenses claiming that the warnings on the drums were fair and sufficient to warn of the potential danger, that the proximate cause of the injury was the employer's intervening negligence in failing to provide an adequate ventilating system or to supply face masks, that plaintiff was contributorily negligent in that having seen one of the warnings, he continued to work in an improperly ventilated area using chemicals which he knew were dangerous, and that plaintiff's medical problems were essentially caused by his smoking and drinking rather than by the brief exposure to fumes from defendant's product. The respective theories of the case were submitted to the jury under what we assume were proper instructions, no exception being raised thereto on appeal, whereupon the jury returned a verdict in favor of defendant.

In this appeal, five claims of error are raised, two of which are *de minimus* and disposed of as noted below.[2] The remaining claims of error are (1) the exclusion of testimony concerning defendant's

---

[2] Error is claimed because during opening argument defense counsel stated plaintiff's medical expert testified frequently for plaintiff's law firm in workmen's compensation cases. Impeachment of a witness by showing interest or bias is proper. We find no error on the basis of *Rumptz v Leahey,* 26 Mich App 438; 182 NW2d 614 (1970). Plaintiff's claim of error regarding time limitations on final oral argument was not preserved for appeal and further, if error occurred, it was harmless.

knowledge of proper and safe handling procedures, (2) the exclusion of testimony regarding Polybond's experience in handling products such as Mistabond, (3) the exclusion of testimony of plaintiff's expert concerning the danger and health hazards of Mistabond. Basically, plaintiff contends that the exclusion of proofs on the three points deprived the jury of information it needed to conclude that the product was so highly dangerous that something more was required by way of warning and instructions than the information on the labels.

Before ruling on the merits of plaintiff's claims of error it will be helpful to recite the principles of law established in similar cases alleging insufficiency in the warning of dangers or insufficiency in the accompanying handling instructions of a manufacturer's product. *Hill v Husky Briquetting, Inc,* 54 Mich App 17; 220 NW2d 137 (1974), *aff'd,* 393 Mich 136; 223 NW2d 290 (1974), *Simonetti v Rinshed-Mason Co,* 41 Mich App 446; 200 NW2d 354 (1972), *Thomas v International Harvester Co,* 57 Mich App 79; 225 NW2d 175 (1974), *Ebers v General Chemical Co,* 310 Mich 261; 17 NW2d 176 (1945).[3] In *Hill,* this Court held that a manufac-

[3] Relying upon *Younger v Dow Corning Corp,* 202 Kan 674; 451 P2d 177 (1969), and *Weekes v Michigan Chrome & Chemical Co,* 352 F2d 603 (CA 6, 1965), defendant has argued that it had no duty to warn plaintiff, Polybond's employee, of any of the dangerous propensities of TDI. Both *Younger and Weekes* rely upon Restatement Torts 2d, § 388, pp 300–301 in the course of discussing a supplier's duty to warn. In particular, comment n seems relevant to the problem raised by defendant. Restatement Torts 2d, § 388, pp 307–310. Additional sections relevant to the problem are § 391, p 318 and § 397, p 334. As noted in the comment to the former, the manufacturer-supplier's duty will not be met merely by supplying the information to the employer if, *inter alia,* the product is "one which is practicable to make carry its own warning and which, if ignorantly used, is very likely to involve a grave risk of death or serious bodily harm". Section 391, p 318. Section 397 seems particularly relevant, in that it applies to a chattel which is compounded under a formula. Mistabond is compounded under a formula, and as noted in Restatement Torts 2d, § 397, comment, p 335, the manufacturer must "bring * * * [adequate] directions home to those who may be expected to use it".

turer who distributes his product for purchase by the public, must give *adequate* directions for use and adequate warnings of potential danger. The adequacy of the warning is usually a question for the jury. *Thomas, supra,* 57 Mich App at 82. The standard by which a jury determines adequacy is

---

While resolution of this issue is not crucial to the disposition of this case, we note that defendant's claim borders upon the "lack of privity" defense regularly raised by manufacturers and specifically abandoned in the State of Michigan. *Piercefield v Remington Arms Co,* 375 Mich 85, 98; 133 NW2d 129 (1965), referred to a number of previous cases and said that they "have put an end in Michigan to the defense of no privity". In particular, *Hill v Harbor Steel & Supply Corp,* 374 Mich 194, 204; 132 NW2d 54 (1965), involving a suit maintained by an employee against his employer's supplier of a welding unit, noted that the welding unit was designed by defendant "expressly for use by Fisher Steel (the employer) and, necessarily, its employees". Defendant did not manufacture and supply Mistabond so that some fictitious entity known as Polybond would use the product. Rather, defendant manufactured and supplied Mistabond so that an employee of Polybond would use the product.

There have been a number of decisions from our Court in which a plaintiff-employee prevailed in his suit against his employer's supplier. Most of the cases involved the manufacturer's duty to design a particular machine so as to guard against unreasonable and foreseeable risk. *See Byrnes v Economic Machinery Co,* 41 Mich App 192, 201; 200 NW2d 104 (1972), *lv den,* 388 Mich 765 (1972) (labeling machine), *Jennings v Tamaker Corp,* 42 Mich App 310, 316; 201 NW2d 654 (1972), *lv den,* 388 Mich 784 (1972) (cardboard baling machine), and *Coger v Mackinaw Products Co,* 48 Mich App 113; 210 NW2d 124 (1973) (log-splitter). Recently, *Thomas v International Harvester Co,* 57 Mich App 79, 81–82; 225 NW2d 175 (1974), found in favor of plaintiff who was injured when a piece of a bearing in a combine hit him in the eye. *Thomas* noted the presence of a statement "Do not strike bearing with hammer", on a box containing the bearings, and held that questions of the manufacturer's duty to warn and the adequacy of whatever, if any, warning were for the jury. 57 Mich App at 82.

*Simonetti v Rinshed-Mason Co,* 41 Mich App 446, 455; 200 NW2d 354 (1972), *lv den,* 388 Mich 784 (1972), found in favor of a plaintiff-employee in a case involving a paint thinner and the issue of whether or not the manufacturer had met its duty to provide an adequate warning to the "users or potential users" of the product. Plaintiff therein was not a "remote" user, but was rather characterized as a user or potential user. Likewise, plaintiff herein was not a remote user, but was obviously a foreseeable, if not an expected user of Mistabond.

Although the above discussion was not essential to the resolution of this case, we felt we should recognize the problem defendant raised, and offer our view of the issue.

the general negligence standard that liability is created by "conduct which falls below the standard established by law for the protection of others against unreasonably great risks of harm". Prosser on Torts, 4th Ed, § 31, p 145. Defendant also introduced the defense of intervening negligence on the part of the employer. Under these circumstances the test to be applied is set forth in *Comstock v General Motors Corp,* 358 Mich 163, 178–179; 99 NW2d 627; 78 ALR2d 449 (1959). In that case the Court held that an intervening negligent act of a third person does not become a superseding proximate cause if the original actor should have realized that a third person might so act or that a reasonable man, knowing the situation existing when the act of the third party was done, would not regard it as highly extraordinary that the third party so acted. This question, too, is usually one for jury determination. *Price v Manistique Area Public Schools,* 54 Mich App 127, 133–135; 220 NW2d 325 (1974), *lv den,* 393 Mich 753 (1974).

1. The deposition of Robert Heitland, a founder of defendant corporation, was read into evidence until mention was made of the manufacturing process used at defendant's plant to produce Mistabond. At that point, defense counsel objected stating that the process involved raw TDI materials which were very dangerous but the final product contained only some 15% TDI. The objection was sustained, it being noted that the balance of the deposition contained only about three pages, all dealing with how defendant handled the product in the manufacturing process.[4]

---

[4] *"THE COURT:* I will sustain the objection at this time.

"I guess that's the rest of the deposition.

*"MR. STEINER:* That's what I am looking to see.

*"THE COURT:* I think so. We are only talking about three pages.

We agree with the ruling of the trial judge. The question and balance of the deposition related to the process of manufacturing involving high quantities of the toxic ingredient TDI, whereas the issue before the jury was the degree of danger in a product containing substantially smaller quantities of TDI. Later in the testimony plaintiff's witness, Dr. Glinski, did state that the hazards from pure TDI and Mistabond would be the same because both give off toxic fumes, but then modified his statement to say that Mistabond gave off a lesser amount of fumes. It would logically follow that a less comprehensive ventilation system would be required in the manufacturing process in which Mistabond was used than in the process of making the product.

2. Plaintiff called Paul Hansen as a witness who testified as to his prior experience in the foam rubber industry including work with General Polyflex of Detroit for whom he worked before coming with defendant. Counsel then asked "what type of equipment General Polyflex had"; to which question objection was made on the grounds of irrelevancy. The objection was sustained and plaintiff's counsel again asked the same question, following which even longer argument ensued concluding with the following:

"*MR. STEINER:* I think I have a right to go into what this man's experience was in dealing with this chemical, in dealing with ventilation in the past and

---

"*MR. STEINER:* Yes, the rest of the deposition deals with how they handle it.

"*THE COURT:* In the manufacturing process?

"*MR. STEINER:* At M & R, yes.

"*THE COURT:* At this point I will sustain the objection." (pp 335–338).

what he knew so that the jury can judge what he might have done or what a reasonable man would do in terms of prior experience.

"*THE COURT:* Prior experience is not really relevant. He may have done it right or wrong, we don't know. If he can testify as an expert or if anyone can testify as an expert what the manufacturer did or should have done, then I would probably allow that. But what you are asking him is what he did in the past, what a previous employer did in the past and his experience in the past. I can see no relevance to this case. I will sustain the objection."

From the above it is clear that the claim of error is stated too broadly. Specifically, the court did not rule out *all* of Hansen's experience but, instead, excluded what kind of machinery a prior employer used. Hansen was allowed to describe in detail the machinery and process used at Polybond and also described his own years of experience with prior concerns. But there was no showing that the machinery or the process employed at Polybond was the same as used at General Polyflex. Basically, plaintiff appears to be arguing that if the employer acted consistent with the manner in which he handled Mistabond in the past, no negligence could be charged to the employer. This rationale assumes that the prior procedures were without negligence. No proof appears in the record that the General Polyflex procedures were identical to the custom of the trade or the same as industry standards. What the employer did in the past is not evidence of any standard of reasonable care and is to be distinguished from what similar employers have commonly done in the past.

"A custom to be relevant, must be reasonably brought home to the actor's locality, and must be so general, or so well known, that the actor may be

charged with knowledge of it or with negligent igno-
rance. The actor's own record of past conduct, which is
commonly called 'habit' rather than custom, is no evi-
dence of any standard of reasonable care, but when he
has departed from it, it may be used against him as
indicating his knowledge of the risk and the precau-
tions necessary to meet it." Prosser on Torts, 3d Ed
§ 33, p 171.

For these reasons we conclude that the excluded
testimony was irrelevant to the issue of the stan-
dard of care to which the employer would be held.
We also find the excluded testimony irrelevant to
the issue of an intervening cause. As to this issue,
it makes no difference that the employer-pur-
chaser may have been inexperienced or may have
designed an improper blending system. The key
question is whether the defendant manufacturer
knew or should have known of such. Nothing was
introduced in evidence showing defendant knew or
should have known of Hansen's alleged inexperi-
ence. In the absence of such foundation evidence
the trial court was justified in sustaining the
objection.

3. Upon direct examination of Dr. Ronald Glin-
ski, chemist and expert witness for plaintiff, ques-
tions were asked regarding his opinion of the
health hazards of TDI or products containing TDI.
Broadly speaking, this took place on three sepa-
rate occasions, the first occurring when the wit-
ness was asked to tell the jury "what the health
hazards are" *of the chemical TDI.* Defense counsel
objected and the following ensued:

*"THE COURT:* We will at a subsequent time. The
specific question now before this witness is is this
substance dangerous.

*"MR. STEINER:* And does it have health hazards.

*"MR. LAKIN:* We will stipulate it has some health hazards.

*"THE COURT:* Defendant agrees it has health hazards. I think maybe that does it."

Plaintiff then moved on to question the witness as to industry standards for labeling TDI, whereupon objection was made for the reason that the question pertained to pure TDI rather than a product, such as Mistabond, containing a small portion of TDI. The objection was sustained.[5] The third occasion for a health hazard objection arose when plaintiff's counsel informed the court he desired to have Dr. Glinski testify to the degree of toxicity and danger of small parts of TDI, specifically when it could be smelled or tasted. Following extended argument between court and counsel, the jury having been excused, the objection was sustained on the grounds that defense counsel had already conceded the product was dangerous and a health hazard:

*"MR. STEINER:* Let me finish, okay? The testimony will be, the testimony will be that if you can smell it and if you can taste it, it is toxic, that that is above the safe level. Okay. That the chemical is a dangerous chemical, that is material, and in light of these facts that you do have a chemical that is this toxic, this dangerous, you have to take into account certain principles and give certain warnings, and the warnings on a drum is not enough.

\* \* \*

---

[5] *"MR. STEINER:* If the principle of law at all applies in this case that the more dangerous the activity, the more care you have to take, if somehow in some way the Court feels that does apply in here, the question of the danger of the pure, of the TDI, how dangerous it is certainly is a factor.

*"THE COURT:* Well, the issue is really how dangerous this compound is, not necessarily how dangerous pure TDI is."

"*THE COURT:* That is conceded, counsel. Mr. Lakin concedes it is toxic and dangerous.

"*MR. STEINER:* Because he concedes, it does not mean I am precluded from proving how dangerous and how toxic it is. I mean —

"*THE COURT:* He concedes it is dangerous. I think the next issue is what is the standard in the industry. What is required of this manufacturer that he violated.

"*MR. STEINER:* If he said as to how toxic and dangerous it is what the standard in the industry is, would that be significant?

"*THE COURT:* Probably not. It is probably not relevant.

*     *     *

"*MR. STEINER:* I am going to find out the nature of the product.

"*THE COURT:* We know the nature of the product. It has been testified to here and Mr. Lakin concedes that it is toxic and dangerous and I think he even conceded it has some volatility and I think the next issue is whether or not this defendant violated the standard in the industry and what they were."

Plaintiff contends that each ruling of the trial court constitutes error and that, collectively, the three rulings severely prejudiced plaintiff.

For reasons different than given by the trial court we sustain the court's ruling on the first occasion described above. On grounds which are spelled out later in this opinion we do not agree that merely because opposing counsel has stipulated the product has "some health hazard" counsel is precluded from detailing the degree of the hazard. But we do note that the question as framed referred to pure TDI rather than to the less toxic product Mistabond and accordingly conclude the trial court properly excluded the response. For the same reason we find no error in

the trial court's ruling on the second occasion described above.

We now turn to the question of the propriety of the court's exclusion of the health hazard testimony on the third occasion. Defense counsel was justified in insisting that the jury should know the warning properties of the product, its toxicity and whether its fumes would cause bronchial asthma. The gravamen of plaintiff's complaint was that the warnings on the drums were insufficient because even the small amounts of TDI found in the manufactured product could be a health hazard. Whether there is a duty to warn at all depends upon whether the injury sustained was foreseeable. *Thomas v International Harvester Co,* 57 Mich App 79; 225 NW2d 175 (1974). Similarly, whether a warning which is given is adequate depends upon whether, despite the warning and instructions, the injury which was sustained was foreseeable. Frumer & Friedman, 1 Products Liability, § 8.03(1). Obviously, the greater the degree of toxicity, the greater will be the foreseeability. To establish foreseeability, plaintiff was compelled to establish not only that the product was dangerous but was obliged to show the degree of danger.

As noted earlier, the trial court excluded the proofs because defendant had stipulated Mistabond was toxic, dangerous, and had some volatility. But this concession was only partial, namely, that "it had *some* health hazards". (Emphasis supplied.) Thus it did not cover the point plaintiff was seeking to impress on the jury, that the product was so dangerous that even its fumes could cause bronchial asthma.[6] We find the situation similar to that

---

[6] *"THE COURT:* Can we save time if Mr. Lakin will stipulate it is dangerous?

*"MR. STEINER:* Will he stipulate it causes bronchial asthma?

*"MR. LAKIN:* I will not."

appearing in 9 Wigmore, Evidence, 3d Ed, § 2591, p 589, which was quoted with approval in *People v Neaton,* 294 Mich 134, 137–138; 292 NW 589 (1940):

"Nevertheless, a colorless admission by the opponent may sometimes have the effect of depriving the party of the legitimate *moral force of his evidence;* furthermore, a judicial admission may be cleverly made with grudging limitations or evasions or insinuations (especially in criminal cases), so as to be technically but not practically a waiver of proof. Hence, there should be no absolute rule on the subject; and the trial court's discretion should determine whether a particular admission is so plenary as to render the first party's evidence wholly needless under the circumstances."

A concession on a material issue which fails to cover all of the facets of the issue will not preclude the opposite party's introduction of evidence on the issue. *People v MacPherson,* 323 Mich 438, 446; 35 NW2d 376 (1949). Accordingly, we find the trial court erred in excluding the proofs of health hazard which plaintiff proposed to submit on the third occasion described earlier.

Though this constitutes error, is it necessarily reversible error? Our Court rules provide that not every error in the exclusion of evidence may form the basis for granting a new trial. GCR 1963, 529.1. See *Illenden v Illenden,* 46 Mich App 710, 714; 208 NW2d 565 (1973). The error is not necessarily prejudicial if the omitted facts are established by other evidence. 3 Honigman & Hawkins, Mich Court Rules Anno, p 228. We have carefully reviewed the extensive record in the present case and find that subsequent to the erroneous rulings, the trial court allowed Dr. Glinski to testify in considerable detail as to the dangers in the product. For example, the court allowed plaintiff's

counsel to ask a hypothetical question advising what the product contained and request determination of the toxicity. Dr. Glinski's response in the presence of the jury was that even if one assumed only 1% pure TDI to be present in a 55-gallon drum, the amount of fumes given off would be equivalent to half a gallon of TDI. Responding to cross-examination, Dr. Glinski stated "if you can smell it you are 50 times over the toxic level". At another point the witness testified the product can cause lung, skin, burn, and liver problems, adding "you name it, it can cause it—it has caused death in the past". Again and again the witness stated that whenever even a small amount of TDI is contained in a mixture there will be toxic vapors. On this basis, the court allowed in evidence the industry standards as contained in the Manufacturing Chemists Association's Chemical Data Sheet and the witness was permitted to compare these with exhibit #1 and explain why, in his opinion, the label on the barrels did not measure up to the standards of the industry. He was allowed to criticize the lack of medical direction in exhibit #1, the fact that the print was all of one size and to assert that a production system using volatile isocyanates which are toxic should be a closed system. We could cite other examples in the voluminous record clearly showing that the health hazard type of danger was made known to the jury. All of this testimony came after the trial court's earlier ruling to exclude the questions as first asked. Accordingly, we find the error harmless.

Affirmed, costs to defendant.