WILLIAMS v THE DETROIT EDISON COMPANY

OPINION OF THE COURT

1. PRODUCTS LIABILITY—TORTS—CONTRACTS—IMPLIED WARRANTY—
   ELECTRICAL SERVICES.
   Electricity is a service rather than a good, but the doctrine of
   implied warranty in tort applies to the installation and deliv-
   ery of electrical services.

2. PRODUCTS LIABILITY—TORTS—CONTRACTS—BREACH OF WARRANTY
   —STRICT LIABILITY—UNIFORM COMMERCIAL CODE—PRIVITY OF
   CONTRACT.
   The Uniform Commercial Code is inapplicable to a tort action
   alleging a breach of implied warranty; privity of contract is an
   irrelevant consideration in a case based upon a tortious breach
   of warranty or strict liability in tort.

3. PRODUCTS LIABILITY—TORTS—CONTRACTS—BREACH OF IMPLIED
   WARRANTY—ELECTRICAL SERVICES—ELEMENTS OF CLAIM—PROX-
   IMATE CAUSE.
   A plaintiff in a suit for tortious breach of an implied warranty of
   electrical services must prove that there was a defect in the
   electricity at the time it left the manufacturer and that the
   defect was a proximate cause of plaintiff's damages.

4. PRODUCTS LIABILITY—TORTS—CONTRACTS—STRICT LIABILITY—ELE-
   MENTS OF CLAIM—NEGLIGENCE—DEFECTIVE PRODUCT.
   A plaintiff in a strict liability in tort suit must prove the presence
   of a defect and that the defect caused plaintiff's injury; a
   defendant's negligence is irrelevent, but the defect must render
   the product unreasonably dangerous to plaintiff and must be
   present when the product left the hands of the seller or
   manufacturer.

REFERENCES FOR POINTS IN HEADNOTES
[1–6, 9–11] 63 Am Jur 2d, Product Liability §§ 4, 7, 123–150.
[7] 5 Am Jur 2d, Appeal and Error § 617.
[8] 5 Am Jur 2d, Appeal and Error § 558.

5. Products Liability—Torts—Contracts—Breach of Implied Warranty—Strict Liability—Transfer of Product—Electrical Services.

There must be a transfer of the product from the manufacturer for recovery of damages under strict liability in tort or breach of implied warranty doctrines; neither doctrine applies to an injury caused by electric power lines where the injury occurred before the electricity left the defendant electric company's control by passing through a customer's meter.

6. Products Liability—Torts—Contracts—Electrical Services—Standard of Care—Ordinary Prudent Person.

The standard of care to which an electric company is held for negligence in the installation and delivery of electrical services is based on the ordinary prudent person standard.

7. Appeal and Error—Judgment—Summary Judgment—Incorrect Reason—Correct Result.

A trial court's correct grant of summary relief premised upon the wrong reason does not affect appellate disposition of the case if it effects the correct result.

8. Appeal and Error—Preserving Question—Instructions to Jury—Failure to Object—Court Rules.

A plaintiff cannot on appeal raise issues concerning the trial court's instructions to the jury where the plaintiff failed to voice objections at trial (GCR 1963, 516.2).

9. Products Liability—Torts—Contracts—Electrical Services—Instructions to Jury—Power Line Design—Reasonably Safe.

An electric company has a duty to reasonably design a power line to protect against reasonably foreseeable risks of harm; therefore, in a suit for wrongful death because a decedent was killed when a power line was knocked down, an instruction to a jury that, if they found the power line was reasonably safe, the electric company would not be responsible in damages because another type of installation might be safer was not an erroneous instruction.

10. Products Liability—Torts—Contracts—Electrical Services—Instructions to Jury—Power Lines—Insulation—Statutes.

An instruction to a jury that a power line 28 feet from the ground was insulated by air space as a matter of law is not erroneous where the height of the line complied with statutory requirements (MCLA 460.554).

CONCURRENCE BY BRONSON, J.

11. PRODUCTS LIABILITY—TORTS—CONTRACTS—ABNORMALLY DANGER-
    OUS ACTIVITIES—STRICT LIABILITY—ELECTRIC SERVICES.

*Summary judgment was properly granted to a defendant electric
company in a suit for damages arising out of a power line
accident where the doctrine of abnormally dangerous activities
or conditions did not apply under the facts and the defendant's
product had not left its control.*

Appeal from Wayne, Joseph G. Rashid, J. Sub-
mitted April 15, 1975, at Detroit. (Docket No.
19452.) Decided August 25, 1975. Leave to appeal
denied, 395 Mich 800.

Complaint by Rosalind Williams, individually
and as administratrix for the estate of Rolyn D.
Williams, deceased, against the Detroit Edison
Company for wrongful death arising out of a
power line accident. Judgment for defendant.
Plaintiff appeals. Affirmed.

*Levine & Benjamin, P. C.,* for plaintiff.

*Fischer, Franklin & Ford* (by *William C. Potter,
Jr.),* for defendant.

Before: ALLEN, P. J., and BRONSON and N. J.
KAUFMAN, JJ.

ALLEN, J. On December 12, 1973, the jury in a
five-to-one decision returned a verdict of no cause
of action in favor of defendant in this wrongful
death action in which plaintiff sought damages to
compensate for the loss of her husband who was
killed when defendant's power line was knocked
down and fell on decedent. Previous to trial, the
trial court granted defendant's motion for partial
summary judgment on the grounds that plaintiff's
counts sounding in breach of warranty and strict
liability failed to state claims upon which relief

could be granted. GCR 1963, 117.2(1). Subsequently to trial, plaintiff's motion for a new trial was denied on January 25, 1974, and plaintiff has appealed.

Rolyn Duane Williams, the deceased, was an employee of the F. J. Siller Company, which on June 14, 1971, was constructing a water line on Joy Road near Haggerty Road. Defendant's overhead electrical power lines ran along the north side of Joy Road, and the incident out of which the case arises occurred at a point five poles east of Haggerty Road. There, the 7600-volt power line crossed Joy to a pole on the south side of the street, and ran from a transformer on that pole to a small home. The testimony reveals that the Siller Company often worked near or under power lines, and John R. Siller, the company's vice-president, testified that between 45 to 55 per cent of the company's projects occurred near power lines.

At about 5:45 p.m., on the day in question, the deceased, foreman of the construction crew, was working on a water pump on the north side of the recently excavated ditch. A back hoe was used to dig the hole, and it then swung around and deposited the soil into a truck. In the course of doing so, the machine's "boom" struck the power line, which then fell onto a generator located near deceased and a fellow worker. The wire "jumped" off the generator, struck the deceased and electrocuted him.

The first part of this opinion deals with that portion of plaintiff's claim taken from the jury by the trial court, *viz.:* defendant's liability in tort under the doctrines of strict liability or implied warranty. The second portion of the opinion concerns the negligence portion of the case, namely, the various jury instructions pertaining to defend-

ant's standard of care regarding insulation, duty to warn, and safety of design.

I.

Pursuant to an examination of *Buckeye Union Fire Insurance Co v Detroit Edison Co,* 38 Mich App 325; 196 NW2d 316 (1972), plaintiff filed an amended complaint on September 20, 1973, and alleged that defendant had breached its implied warranty of fitness and merchantability that the electricity would be dispersed and serviced in a merchantable quality and that it would be located in a proper and safe fashion. Further, plaintiff alleged that there was an implied warranty that the service of electricity would be rendered in a proper manner and that defendant had breached this warranty. Further, plaintiff alleged that the electricity was an unreasonably dangerous product or service, and that it presented an unreasonable danger to plaintiff's decedent and that therefore defendant was strictly liable for the damages caused thereby. After argument November 15, 1973, at which time defendant argued that plaintiff failed to state a cause of action on the above two grounds because there had not been a sale of the electricity, the trial court agreed and granted the motion for partial summary judgment. The trial court stated that there was no sale of electricity until it had passed through the transformer and household meter, and rejected plaintiff's argument that a sale was unnecessary.

On appeal, plaintiff argues that plaintiff was deprived of two-thirds of her claim when the trial court allowed the jury to only consider the issue of negligence; that a sale was not necessary to create the imposition of liability based upon breach of warranty or strict liability, and that the concept of

privity is irrelevant in a tort action. On the other
hand, defendant relies upon MCLA 440.2314; MSA
19.2314, for the proposition that there must be a
sale or transfer of the product before liability
based upon breach of warranty could be imposed.
Defendant argues that the electricity never left
defendant's control and that there would be a sale
of the power only after it had reached the house-
hold meter located across the street from where
plaintiff's decedent met his death.

At the outset of our discussion, we note that the
"product" involved in this case is not a tangible
item like an automobile, punch press or Coca-Cola
bottle. Rather, it is a form of energy which in this
case consisted of 7600 volts traveling in an uncov-
ered line about 28 feet above the ground. Electric-
ity is a service rather than a "good," but the
doctrine of implied warranty has been held to
apply to its sale. *Buckeye Union Fire Insurance Co
v Detroit Edison Co,* 38 Mich App 325, 329; 196
NW2d 316 (1972). Our Court has noted that *Buck-
eye* did not definitively limit the application of
implied warranty, and has applied this concept to
the manner in which some electrical wiring and
its attendant hardware were installed. *Insurance
Co of North America v Radiant Electric Co,* 55
Mich App 410, 412; 222 NW2d 323, 325 (1974), *lv
den,* 393 Mich 763 (1974). Thus, the doctrine of
implied warranty in tort is applicable to the instal-
lation and delivery of electrical services, and it is
our task to determine whether it is applicable to
the instant situation.

The Uniform Commercial Code, which defendant
relied upon, is inapplicable to a tort action alleg-
ing a breach of implied warranty. *INA v Radiant
Electric Co, supra,* 55 Mich App at 412; 222 NW2d
at 324–325 (1974), *Cova v Harley Davidson Motor*

*Co,* 26 Mich App 602, 613; 182 NW2d 800 (1970). Plaintiff's suit is grounded in tort, rather than contract, and the warranty is implied in fact or in law rather than pursuant to a contract. 2 Frumer and Friedman, Products Liability (1975 ed), § 16.01[1] pp 3–4 and 3–7. Comment, *Products Liability in Michigan: Implied Warranty, Strict Tort, or Both?* 15 Wayne L Rev 1558, 1564, 1571 (1969). Privity of contract is an irrelevant consideration in a case based upon a tortious breach of warranty or strict liability in tort. *Hill v Harbor Steel & Supply Corp,* 374 Mich 194, 202; 132 NW2d 54 (1965), and *Piercefield v Remington Arms Co,* 375 Mich 85, 98; 133 NW2d 129 (1965). See also *Gutowski v M & R Plastics & Coating, Inc,* 60 Mich App 499, 506–507, fn 3; 231 NW2d 456 (1975). *Piercefield* allowed recovery for breach of warranty in which a bystander was injured when defendant's product exploded. Clearly, there was no sale to that bystander. Also, *Hill* allowed an employee to recover where there was no sale of a good to the employee.

Having determined that the doctrine of implied warranty in tort applies to a "products" liability case involving electricity, and that the UCC and other contractual concepts do not apply to such a case, we must now determine the elements of this cause of action. Generally, plaintiff must prove that there was a defect in the electricity "at the time it left the manufacturer", and that this defect was a proximate cause of plaintiff's damages. *Buckeye Union, supra,* 38 Mich App at 330; 196 NW2d at 318. The manufacturer's standard of care, while a relevant factor in a negligence suit, is inapplicable to a warranty action, and *Buckeye's* recital of the elements of such a suit comports with the general rule in this area of the law. See 2

Frumer and Friedman, Products Liability, § 16.03[4], p 3–53, *Snider v Bob Thibodeau Ford, Inc,* 42 Mich App 708, 713; 202 NW2d 727 (1972), (relying upon *Piercefield, supra).*

We have seen that plaintiff alleged that defendant was also liable under the doctrine of strict liability. A contractual defense such as lack of privity is inapplicable to such a suit, and a non-purchasing bystander generally is allowed to recover under this theory. 2 Frumer and Freidman, Products Liability, § 16A[5], p 3–345, and *Anno: Products Liability: Extension of strict liability in tort to permit recovery by a third person who is neither a purchaser nor user of product,* 33 ALR3d 415, § 3, p 419.[1]

In a strict liability in tort case, plaintiff must prove the presence of a defect and that this defect caused plaintiff's injury. Defendant's negligence is irrelevant. 2 Frumer and Friedman, Products Liability, § 16A[4] [e], p 3–304. Generally, the defective condition of the product must render that product unreasonably dangerous to plaintiff. 63 Am Jur 2d, Products Liability, § 132, p 138. Further, the doctrine of strict liability generally only applies if the defect "was present when the product left the hands of the seller or manufacturer * * * ". *Anno: Products liability: Proof, under strict tort liability doctrine, that defect was present when products left hands of defendant,* 54 ALR3d 1079, § 1, p 1082. Although the latter failed to include in its discussion cases dealing with implied warranty, it

---

[1] The latter source, citing *Piercefield v Remington Arms Co, supra,* notes that Michigan is a jurisdiction allowing a bystander to maintain an action in strict liability in tort on the grounds that *Piercefield* cited *Greenman v Yuba Power Products, Inc,* 59 Cal 2d 57; 27 Cal Rptr 697; 377 P2d 897 (1963), the landmark decision in this area. 63 Am Jur 2d, Products Liability, § 144, p 150, states that the "better view" allows an injured bystander to utilize the strict liability in tort remedy.

noted that the application of the doctrine of implied warranty may have the same or substantially the same results as applying the doctrine of strict tort liability. 54 ALR3d at 1083.

Regardless of whether the tortious conduct is labeled a breach of warranty or whether the claim is founded on strict liability in tort, it seems that plaintiff must basically prove (1) existence of a defect, (2) causation, and (3) the fact that the defect was present when it left the manufacturer's control. An examination of the cases discloses that in each instance, there had been a transfer of the product from the manufacturer's control to some third person.[2] In either a case of warranty or strict liability in tort, it seems clear that there must be a transfer of the product from the manufacturer. The manufacturer must give up control of the good or service. While the same elements are involved in both strict liability and in a warranty claim, and while many commentators have urged the adoption of the language "strict liability in tort" to avoid encumbering tort action with "contractual baggage"[3], both doctrines are inapplicable

---

[2] In *Greenman, supra,* there had been a sale of the defective power tools to the plaintiff's wife. 59 Cal 2d at 59; 27 Cal Rptr at 698; 377 P2d at 898. *Piercefield, supra,* involved the distribution of defendant's product to a wholesaler, who sold it to a hardware store, which in turn sold it to plaintiff's brother. 375 Mich at 88; 133 NW2d at 130. *Piercefield, supra,* referred to a number of other cases in support of its contention that privity was no longer a defense in a tort claim. 375 Mich at 98; 133 NW2d at 134–135. *Spence v Three Rivers Builders & Masonry Supply, Inc,* 353 Mich 120; 90 NW2d 873 (1958), involved the sale of the product involved therein, as did *Manzoni v Detroit Coca-Cola Bottling Co,* 363 Mich 235; 109 NW2d 918 (1961). *Barefield v LaSalle Coca-Cola Bottling Co,* 370 Mich 1; 120 NW2d 786 (1963), also involved a product that had apparently been sold, and *Hill v Harbor Steel & Supply Corp,* 374 Mich 194; 132 NW2d 54 (1965), involved a bailment in which defendant furnished the defective welding unit to plaintiff's decedent's employer and retained ownership of the machine. However, the manufacturer had in fact transferred the machine to the employer.

[3] Prosser, Torts (4th Ed), §§ 97–98, p 656, and Comment, *Products*

to this case since there had been no transfer of the product out of the defendant's control. As noted in *Buckeye Union, supra,* electricity does not leave Edison's control until it passes through a customer's meter. 38 Mich App at 330 fn 4; 196 NW2d at 318. The ill-fated contact with defendant's wire and its subsequent descent onto plaintiff's decedent did not involve placing the electricity "into the stream of commerce", and was not the type of transfer which triggers the application of the doctrines at issue.

We further note that in a case involving a model airplane's contact with uninsulated power lines and the resulting burns to the minor person holding the cable that controlled the plane, Wisconsin has chosen not to extend the doctrine of strict liability in tort on the grounds that the product (electricity) had remained in the power company's control. *Kemp v Wisconsin Electric Power Co,* 44 Wisc 2d 571, 583; 172 NW2d 161, 166 (1969). Thus, despite the fact that Wisconsin, like Michigan, allows a bystander to recover and does not recognize the defense of lack of privity in a strict liability in tort case, *Howes v Hansen,* 56 Wisc 2d 247; 201 NW2d 825 (1972), it also precludes one from asserting that cause of action where the product has yet to leave the defendant's control. Therefore, we find that the trial court properly found that plaintiff failed to state a cause of action in either implied warranty or strict liability in tort where Edison did not release control of its product.[4]

---

*Liability in Michigan: Implied Warranty, Strict Tort, or Both?,* 15 Wayne L Rev 1558, 1572–1573 (1969).

[4] Recently, our Court has noted that there is no such thing as "strict liability in tort" in Michigan. *Rutherford v Chrysler Motors Corp,* 60 Mich App 392, fn 1; 231 NW2d 413 (1975). On the other hand, *Continental Casualty Co v Westinghouse Electric Corp,* 327 F Supp 720, 723 (ED Mich, 1970), felt that Michigan, in *Piercefield,*

As noted in *Cova, supra,* the strict liability in
tort which we discussed above differs from the
term "strict liability" as it applies to abnormally
dangerous activities. 26 Mich App at 613; 182
NW2d at 806. See also Prosser, Torts, § 75, p 494
and § 78, pp 505–506. This doctrine had as its
foundation the famous English case, *Rylands v
Fletcher,* 3 H&C 774; 159 Eng Rep 737 (1865),
*reversed,* LR 1 Ex 265 (1866), *affirmed,* LR 3 HL
330 (1868), in which defendants-mill owners were
liable for damage done when water broke through

---

*supra,* had "adopted the strict tort doctrine under the guise of the
implied warranty theory". Further, "the doctrine of strict liability in
tort has been rapidly accepted in many other products liability cases".
*Anno: Products Liability, Strict Liability in Torts,* 13 ALR3d 1057, § 2,
p 1065. Former Judge, now Justice, LEVIN wrote extensively on
whether Michigan should utilize the phrase strict liability in tort or
should be an implied warranty jurisdiction. *Cova v Harley Davidson,*
26 Mich App 602, 612–613; 182 NW2d 800 (1970). LEVIN felt that it
was apparently unsound to label defendant's liability as "strict liabil-
ity", and suggested that the liability be called "product liability". 26
Mich App at 611 and 614. *Cova* involved a suit for breach of implied
warranty maintained by a plaintiff who had purchased some golf
carts which had been manufactured by defendant. The carts did not
operate properly, and plaintiff claimed damages for economic loss
rather than personal injury. The damages claimed were for cost of
repairs and rentals lost while the carts were under repair. 26 Mich
App at 604, fn 1. In California, home of the strict liability decision in
*Greenman, supra,* such losses may only be claimed in an action for
breach of warranty. The doctrine of strict liability in tort is inapplica-
ble to such a claim, and is apparently limited to claims for personal
injury and/or property damage. *Seely v White Motor Co,* 63 Cal 2d 9;
45 Cal Rptr 17; 403 P2d 145 (1965). *Seely* was authored by former
Chief Justice Traynor, who also authored *Greenman.* Traynor said
that sales law, in particular the UCC, governs economic relationships
between suppliers and users of goods, whereas the doctrine of strict
liability in tort was designed to govern the problem of physical
injuries. 403 P2d at 149. While this portion of *Seely* was criticized as
dictum by both the dissent therein, 403 P2d at 152 (Peters, J.) and by
the court in *Union Oil Co v Oppen,* 501 F2d 558, 565 (CA 9, 1974),
perhaps this idea of applying the warranty rationale to an economic
loss played some subconscious part in the discussion of *Cova* as to
whether Michigan should utilize the term strict liability in tort or
breach of warranty. In any event, our disposition of the issue allows
us to avoid resolving the problem of which language should be used to
describe a products liability case involving a claim that defendant's
product was defective and that the defect was a proximate cause of
plaintiff's damages.

a reservoir they had constructed upon their land and flooded an adjoining mine owned by plaintiff. The final House of Lords decision in the case, LR 3 HL 330 (1868), held that defendant would be absolutely liable for damages resulting from a nonnatural use of defendant's land. Prosser, Torts (4th Ed), § 78, p 505. See *Smith v Chippewa County Road Commissioners,* 5 Mich App 370, 373; 146 NW2d 702 (1966), *aff'd,* 381 Mich 363; 161 NW2d 561 (1968), involving the attempt to impose liability for damages caused by escaped water running onto the land of another and the defense of an act of God in such a situation. As noted in the Supreme Court's treatment of that case, *Rylands v Fletcher, supra,* is applicable to the case. 381 Mich at 380; 161 NW2d at 568 (BLACK, J, dissenting on grounds that defendant failed to make out question for jury on whether defense of act of God should apply). See also *White v McLouth Steel Corp,* 18 Mich App 688, 690, 694; 171 NW2d 662 (1969), which, while primarily involving an indemnification agreement between plaintiffs' employer and a third party, also noted that plaintiffs had set forth a case of strict liability against defendant on the grounds that the blasting activity being carried on at defendant's premises "was an inherent danger" and an ultra-hazardous activity. Prosser has noted that blasting is one of the activities which falls within the concept of strict liability for abnormally dangerous things and activities. Prosser, Torts (4th Ed), § 78, pp 513–514. The question now before us is whether the maintenance of an uninsulated 7600-volt power line roughly 28 feet above ground level is an abnormally dangerous activity or thing for which defendant should be absolutely liable when it causes injuries to another person.

There can be no question that electricity is a dangerous force. It is said in 26 Am Jur 2d, Electricity, Gas, and Steam, § 1, p 214:

"The extensive and diverse use of it has demonstrated the fact that electric force is one of the most powerful and dangerous agencies of nature, and even when restrained or controlled by the most perfect machinery and appliances, its high-tension currents are extremely dangerous in many ways and directions."

Generally, the standard of care to which an electric company is held is usually premised upon a negligence concept. The power company's care has been said to be in proportion to the danger involved, and the power company is usually held to the "ordinary prudent person" standard. See *Wilhelm v The Detroit Edison Co,* 56 Mich App 116, 126–127; 224 NW2d 289 (1974), and cases cited therein. See also *Anno: Liability of electric power company for injury or death resulting from contact of crane, derrick, or other movable machine with electric line,* 69 ALR2d 93, § 3, p 98 and *Anno: Liability for injury or death resulting when pipe or other object is manually brought into contact with electric line,* 69 ALR2d 9, § 3, p 15. While Michigan has applied the implied warranty theory to electricity and has noted its inherently dangerous qualities, *Buckeye Union v Detroit Edison,* 38 Mich App 325; 196 NW2d 316 (1972), and *INA v Radiant Electric Co,* 55 Mich App 410; 222 NW2d 323 (1974), Michigan has yet to impose the doctrine of strict liability based on an abnormally dangerous or inherently dangerous activity upon an electric power company.

As noted earlier in our discussion regarding *Rylands v Fletcher, supra,* England applied the doctrine of strict liability to a "non-natural" use of

one's property. It has been noted that electricity in a household wire is a natural use, and that strict liability will not be imposed for injuries resulting therefrom. Prosser, Torts (4th Ed), § 78, p 506, fn 61 and cases cited therein. On the other hand, apparently, the *Rylands* rule will apply to "high-powered electricity under the street * * * ". *Id.,* fn 63, and cases cited therein.

In California, an apparent leader in this area of liability, *Luthringer v Moore,* 31 Cal 2d 489, 500; 190 P2d 1, 8 (1948), applied the strict liability theory based upon an ultra-hazardous activity to the use of hydrocyanic acid gas in the fumigation of a small shop to exterminate cockroaches and other vermin. However, California has chosen not to extend this doctrine to the maintenance of electric power lines. California continues to hold its electric power line companies to the standard of reasonable care under the circumstances. *McKenzie v Pacific Gas & Electric Co,* 200 Cal App 2d 731, 736; 19 Cal Rptr 628, 631 (1962), *overruled on other grounds, DiMare v Cresci,* 58 Cal 2d 292, 299; 23 Cal Rptr 772, 776; 373 P2d 860 (1962). Despite the fact that England has chosen to apply ultra-hazardous liability to the maintenance of power lines under the street, see *Prosser, supra,* at 506, we choose to follow California's example and hold the power company to the "reasonable man" standard of care rather than impose liability based upon the maintenance of an ultra-hazardous activity. Therefore, plaintiff failed to state a claim upon which relief could be granted, and the trial court's decision to preclude the submission of proofs on this point, although based upon the wrong reason, reached the correct result.[5]

---

[5] A trial court's correct grant of summary relief premised upon wrong reason does not affect appellate disposition of the case. *Buckeye Union v Detroit Edison,* 38 Mich App 325, 332; 196 NW2d 316 (1972).

## II.

This portion of the opinion is concerned with plaintiff's claims that the trial court erred in a number of its jury instructions. Plaintiff argues that one of the instructions[6] given by the trial court—an instruction based upon the decision of *Koehler v Detroit Edison Co,* 383 Mich 224; 174 NW2d 827 (1970), as to the duty of an electric power company to warn of the danger of electric power lines—was erroneous because the instant case differs factually from *Koehler.* Plaintiff urges that *Koehler* be replaced and that we adopt the principles discussed in *Black v Public Service Electric & Gas Co,* 56 NJ 63; 265 A2d 129 (1970), and *Ahearn v Florida Power & Light Co,* 129 So 2d 457 (Fla App, 1961).

At the outset, we reject plaintiff's offer that we somehow overrule the principles found in *Koehler.* Plaintiff's argument should be made to the Michigan Supreme Court. We find the instruction was proper but suggest that at some point the instruction be given in both contexts—where the plaintiff had knowledge or reason to know of the dangerous

---

[6] "Now, was the Edison Company negligent in its failure to warn or to de-energize? I say to you that if you find that the construction workers there knew of the danger of the power lines or to de-energize them, and the workers involved are accustomed to working around power lines and when they know of the presence of the power lines in question and could have requested that the utility company de-energize the line and considered it necessary, and if you find that there was sufficient room in which to work, and if you find that the utility company knew the construction was going on under its line, and if you find that Rolyn Williams and other members of the Siller crew were accustomed to working in the vicinity of power lines, knew of the danger presented by power lines, knew of the presence of the power line in question thought they had sufficient room in which to work and could have requested the Edison to de-energize the line if they considered it necessary, then you are instructed, if you find those facts to be true, that the Edison Company had no duty to warn Mr. Williams or the other members of the crew of any danger presented by the line or to de-energize the line in question."

situation and where plaintiff claims he did not. In the instant case the trial court in an earlier part of his instructions did state the claim of plaintiff.

We also find that none of plaintiff's claims have been preserved for appellate review. Plaintiff's counsel failed to voice objections to the trial court's instruction that the power line was insulated as a matter of law in view of the air space between the line and the ground, said instruction being based upon *Dees v L F Largess Co,* 1 Mich App 421, 427; 136 NW2d 715 (1965). Plaintiff's counsel also failed to object to the trial court's jury instruction as to the power company's duty to warn plaintiff's decedent and his fellow crew members. Finally, plaintiff's counsel failed to object to the trial court's jury instruction that defendant would not be negligent in the design of its power transmission line merely because there was another method of design which some have considered to be safer. While counsel apparently raised objection and engaged in a discussion as to the propriety of the trial court's instructions on proximate cause, and while the trial court clarified those instructions, no objection was raised to any of the above issues. Therefore, we find that having failed to voice objections, plaintiff cannot now raise these issues on appeal. GCR 1963, 516.2. *Wilhelm v The Detroit Edison Co,* 56 Mich App 116, 132, 152–154; 224 NW2d 289, 297, 306–307 (1974).

In any event, we find that the trial court's instruction as to defendant's duty comported with *Koehler, supra,* and the recent decision of *Wilhelm v Detroit Edison Co, supra,* 56 Mich App at 126–127; 224 NW2d at 294–295. The trial court's statement that Edison would have no duty to warn plaintiff's decedent or no duty to de-energize the

power line was premised upon the instruction that if the jury found a number of facts to be true, including the factors present in *Koehler,* 383 Mich at 231; 174 NW2d at 830–831, no duty on defendant's part would arise. The trial court did not say that Edison lacked the duty to warn and to de-energize, but rather instructed the jury that if they found certain facts to be true, then Edison would not have a duty.

As to the design problem, the court instructed the jury that if they found the line to be reasonably safe, Edison would not be responsible in damages merely because another way of installation was thought to be safer. The trial court did not instruct the jury that the line was reasonably safe, but rather instructed the jury that if they found the line to be reasonably safe, Edison was not bound to go beyond what they had already done. Said instruction in effect told the jury that Edison had the duty to reasonably design a power line to protect against reasonably foreseeable risks of harm, and we find no error. See *Wilhelm, supra,* 56 Mich App at 149; 224 NW2d at 305, and cases cited therein.

As to the instruction that the power line was insulated as a matter of law, we find no error. The line was approximately 28 feet from the ground (some testimony disclosed that the wire was approximately 29 feet from the ground at the point where the back hoe hit the wire), and we find that this complied with the standards of MCLA 460.552; MSA 22.152, MCLA 460.554; MSA 22.154 and 1954 AACS, R 460.521(38), cited in *Dees v L F Largess Co,* 1 Mich App 421, 427; 136 NW2d 715 (1965). In particular, MCLA 460.554; MSA 22.154, requires the height of the line at the highway crossing to be not less than 22 feet. Plaintiff does

not dispute the fact that the line met this height requirement. These lines were insulated by air space as far as one located on the ground was concerned, and we find no error in the instruction.

Affirmed, costs to defendant.

BRONSON, J., *(concurring)*. Due to the scope of Judge ALLEN's opinion, I feel that I must emphasize that I agree only with his conclusions on the issues which have to be decided in this particular case. Specifically, I agree that the trial judge properly granted a partial summary judgment because:

(1) The doctrine of "abnormally dangerous activities or conditions" does not apply here, so that plaintiff cannot claim strict liability on that basis; and

(2) Defendant's product had not left its control, making Michigan's products liability doctrine (whether termed "strict liability", "implied warranty in tort", or "products liability") inapplicable here.

I agree with Judge ALLEN's conclusion that plaintiff's only cause of action against Detroit Edison for her decedent's injuries must be based upon Edison's negligence, and with his analysis of the jury instructions on the negligence claim.